[No. 27115-6-I.   Division One.   September 9, 1991.]

ROBERT L. BARRETT, ET AL, *Appellants*, v. RUDOLPH PACHECO, ET AL, *Respondents*.

*Paul Hanson* and *Gary I. Greenbaum,* for appellants.

*Robert N. Gellatly, Lish Whitson,* and *Helsell, Fetterman, Martin, Todd & Hokanson,* and *Michael D. Kraft,* for respondents.

AGID, J. — Robert Barrett and Cindi Ketchum, husband and wife,[1] appeal the trial court's order of summary judgment dismissing their negligent supervision action against Rudolph and Margaret Pacheco. Barrett contends that the Pachecos knew or should have known about their son's "dangerous proclivity" and that they failed to take reasonable measures to control such proclivity. We affirm.

About 2 a.m. on May 21, 1987, 14-year-old Arthur Pacheco shot Robert Barrett, a police officer, while committing a burglary at a middle school in Lynnwood. Barrett recovered from his injuries and returned to work as a police officer. Arthur Pacheco pleaded guilty to first degree assault and second degree burglary and was sentenced to a juvenile detention center until age 21.

Immediately after the shooting incident, police searched the Pacheco family residence. Arthur's bedroom was locked from the inside, requiring the officer to kick in the door to gain entry. In searching the bedroom, police found a pipe bomb and two large incendiary devices, .22 caliber ammunition rounds, shotgun shells (with the tops cut off and contents missing), substances used in making explosives and various Ninja weapons. The officers also found a book and computer printouts on how to make black powder, pipe bombs and other explosives, numerous magazines about Ninjas and pictures of weapons.

On the night of the shooting, Arthur said goodnight to his father around 10 p.m. and went into his bedroom. Both parents worked a graveyard shift, and Arthur's mother had left for work at 10 p.m. At 12:30 a.m., before leaving for work, Arthur's father knocked on his bedroom door. Arthur did not answer, and his father left the house.

The police contacted Arthur's father, Rudolph Pacheco, at work shortly after the shooting. When he learned that his son had shot a police officer, Rudolph stated that he was embarrassed by the "situation" but not surprised. He

---

[1]Hereafter collectively referred to as "Barrett".

also said he supposed his son had been dressed in a Ninja outfit that night.[2]

When Arthur first acquired an interest in guns, his father had enrolled him in a safety course to learn respect for and proper handling of guns and had enforced the rules taught in the class. Arthur owned two .22 caliber rifles, as well as pellet and BB rifles. His father had bought him one of the rifles and was aware that Arthur had purchased one himself. Arthur had been target shooting with his father several times. His father allowed him to shoot his guns only in his presence and only in the country.

In the 6 months preceding the shooting, Arthur had committed three second degree burglaries involving vandalism of a school and two vacant houses. He had also been convicted of attempted theft. Arthur committed all of these crimes with another boy or with a group of boys. Additionally, about a month before the shooting incident, when no one else was home, Arthur put a flammable substance down the Pachecos' chimney, causing a fire or explosion which singed his eyebrows and forehead.

On one occasion, Rudolph Pacheco caught Arthur sneaking out of the house through his bedroom window. Rudolph reacted by tying up Arthur and putting him into bed with him to prevent him from leaving the house. According to Arthur, during the month before the shooting, he had sneaked out through the window several times while his mother was asleep and his father was at work. He went out dressed as a Ninja,[3] once armed with a throwing star and knife. His parents were not aware of any of these outings.

When they learned of Arthur's burglaries and vandalism, Arthur's parents imposed severe restrictions on him. Either the parents or a neighbor drove Arthur to and from

---

[2]Arthur was, in fact, wearing a Ninja-type outfit when police arrested him.

[3]Arthur's parents had bought the Ninja outfit for him. They said they did not know what a Ninja was when they bought the outfit, which looked to them like black pajamas.

school. They did not allow him to walk home, and they watched him closely. As punishment, the parents removed Arthur's guns from his room and made them "off-limits".[4] The gun that Arthur used to shoot Barrett was not one of the guns his parents had put away — Arthur had stolen it.

Arthur's parents immediately sought psychological counseling for him after he was arrested for the burglaries. He participated in therapy twice a week. They also encouraged him to associate with "better" friends. He became interested in skateboarding and began spending time with a group of "good" kids who enjoyed that activity. Two days before the shooting, Arthur's school vice-principal told his mother that Arthur was doing much better in school. According to reports by Arthur's therapist and teachers, he was doing "very well". In their affidavit, Arthur's parents stated that the shooting was "totally out of character." Arthur had never been in any fights or physical disruptions at school. Neither of his parents had ever seen him act violently toward another person.

■■ Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. CR 56; *Christen v. Lee*, 113 Wn.2d 479, 488, 780 P.2d 1307 (1989). We engage in the same analysis as the trial court, considering all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Lee*, 113 Wn.2d at 488; *Hartley v. State*, 103 Wn.2d 768, 698 P.2d 77 (1985). However, the nonmoving party has the burden of showing specific facts that would support a genuine issue for trial and cannot rely on mere allegations. *Bald-*

---

[4]The guns were placed in a wicker suitcase in the parents' bedroom closet. Arthur's father checked the guns every day to ensure that Arthur had not removed any of them. However, Arthur's mother told police that she had checked the guns about a month before the shooting and noticed the suitcase had been opened. Although it occurred to her that Arthur may have taken a pistol, she had not been sure.

*win v. Sisters of Providence in Wash., Inc.*, 112 Wn.2d 127, 132, 769 P.2d 298 (1989).

■ Under the doctrine of negligent supervision, parents are liable for the intentional torts of their minor children when: (1) the child has a dangerous proclivity; (2) the parents know of the child's dangerous proclivity; and (3) they fail to exercise reasonable care in controlling that proclivity. *Norton v. Payne*, 154 Wash. 241, 244-45, 281 P. 991 (1929); *Eldredge v. Kamp Kachess Youth Servs., Inc.*, 90 Wn.2d 402, 408, 583 P.2d 626 (1978); *Carey v. Reeve*, 56 Wn. App. 18, 22, 781 P.2d 904 (1989).[5]

In the present case, the trial court found that, because there was no evidence showing that Arthur was likely to commit a homicidal act, the parents could not have had knowledge of such a dangerous proclivity. Having determined that plaintiffs failed to show a genuine issue of material fact with respect to the parental knowledge element of their negligent supervision claim, the trial court concluded that the Pachecos were entitled to summary judgment as a matter of law and dismissed plaintiffs' complaint.

On appeal, Barrett assigns error to the trial court's dismissal, contending that he was not required to show that the Pachecos knew Arthur had the propensity to commit a violent act similar to the one he committed

---

[5]The Restatement (Second) of Torts § 316 (1965) provides that a parent is liable for the torts of his or her child when the parent "(a) knows or has reason to know that he has the ability to control his child, and (b) knows or should know of the necessity and opportunity for exercising such control." In the two Washington cases addressing the issue of parental knowledge, the court found that the parents had actual knowledge of the necessity to control their child. *See Norton v. Payne, supra; Eldredge v. Kamp Kachess Youth Servs., Inc., supra. Norton* and *Eldredge* therefore did not reach the issue of whether parents could be held liable based on their constructive knowledge of their child's dangerous proclivity. As we indicate, *infra*, even if the parents here had known about their son's apparent obsession with the Ninja cult and what he kept in his room, that knowledge would not have been enough to put them on notice that he would shoot or otherwise assault someone. Therefore, while we do not foreclose adoption of the Restatement formulation in another case, we find it unnecessary to address on these facts Barrett's argument that, in the event the parents were unaware of their son's behavior, they should have known about it.

here. He further contends that even if such a showing was required, there is sufficient evidence of Arthur's dangerous proclivity to allow a jury to conclude that the Pachecos had the requisite knowledge.

Our Supreme Court first addressed the issue of parental liability for a child's intentional tort against a third person in *Norton*. In *Norton*, the guardian ad litem of a 5-year-old child brought a negligence action against the parents of a 7-year-old who had struck the other child in the eyeball with a stick. The mother of the 7-year-old admitted that her child had a habit of striking other children with sticks. Additionally, the evidence revealed that the child's father had actually encouraged her attacks on other children. From this evidence, the court determined that there was a sufficient showing of the child's dangerous habit and her parents' knowledge of it to warrant submitting the issue of the parents' negligence to the jury. 154 Wash. at 248.

In *Eldredge*, plaintiff sued a group child-care facility to recover damages caused by three of its resident children who had escaped from the facility, stolen plaintiff's car and damaged it. Just 2 weeks earlier, two of the boys had escaped from the facility and stolen and damaged another automobile. When the boys returned from juvenile detention after the first incident, Kamp accepted them back and reassigned them to the same "open" physical facility from which they had escaped without increasing their supervision. The trial court found in favor of the plaintiff.

On appeal, Kamp argued that it could not have foreseen that its decision to reassign the boys to the same physical facility without increasing their supervision would allow the boys to commit a similar tortious act. The court disagreed. Applying the standard of care imposed on a parent to Kamp, it concluded that Kamp could have or should have foreseen that the boys would again escape and steal and damage a vehicle. Accordingly, the court affirmed the judgment in favor of plaintiff. 90 Wn.2d at 408-09.

■ In *Norton* and *Eldredge*, the children had previously committed the *same* tortious act as that which ultimately injured the victim, thereby putting the parents and child-care facility on notice that the children had a dangerous proclivity and that they might commit that violent act again.[6] However, we do not believe those cases stand for the proposition that the child's prior acts must be identical to the tortious conduct in order to put the parents on notice that the child might commit a violent act again.

Rather, as courts in other jurisdictions have held, the child's dangerous proclivity must be of the same or similar nature as the ultimate tort or crime which injures the victim. In *Pesek v. Discepolo*, 130 Ill. App. 3d 785, 475 N.E.2d 3 (1985), for example, a rape victim brought a claim for negligent supervision against the parents of the 15-year-old perpetrator, alleging that the child's prior acts put the parents on notice of their child's violent propensity. The defendants' son had raped the victim at her home during a school day. The plaintiff contended that the parents knew or should have known that their son was often truant, that he associated with juvenile delinquents, that he had committed "criminal or quasi-criminal acts" in the past, and that he was frequently under the influence of drugs or alcohol. 475 N.E.2d at 3-4. The plaintiff failed to allege, however, "that the parents had any knowledge of similar acts of violence committed by [their son]". *Pesek*, 130 Ill. App. 3d at 787. Holding that, in the absence of such an allegation, the plaintiff failed to state a cause of action against the parents, the court affirmed the trial court's order of dismissal. 475 N.E.2d at 5.

Similarly, in *Robertson v. Wentz*, 187 Cal. App. 3d 1281, 232 Cal. Rptr. 634 (1986), the court affirmed the trial court's summary judgment dismissing plaintiff's negli-

---

[6]The facts of the present case are distinguishable, of course, because Arthur had never committed a tort or crime of violence against another person until he shot Barrett.

gent supervision action[7] in favor of the mother of a 17-year-old boy who shot and killed a woman. The boy, under the influence of drugs, shot the victim while robbing a store. The boy's parents had introduced him to guns when they gave him a .22 caliber pistol for his fifth birthday. However, he was not permitted to hold the gun until he had taken a safety course at age 10. Although the mother allowed her son to own two rifles, two pellet pistols and a shotgun, her son had not shown a propensity to misuse a gun and she was not aware of any incident in which he had done so. 232 Cal. Rptr. at 635.

Despite the mother's knowledge that her son had been disciplined for one incident of misconduct at school, that he frequently used alcohol and other drugs, that he had been arrested for possession of marijuana, and that he was interested in guns, the court nevertheless determined that the record was devoid of any evidence suggesting that the mother was aware of her son's violent tendencies.[8] Holding that one of the prerequisites to imposing parental liability on a negligent supervision theory was the parent's knowledge of her child's propensity to commit violent crimes, the court stated:

> Appellant submits that respondent's awareness of her son's "numerous troubles" and failure to obtain counseling for the boy, or otherwise control his abuse of drugs, permits a finding of liability on this theory. *But it is only the manifestation of specific dangerous tendencies which triggers a parental duty* to exercise reasonable care to control the minor child in order to prevent intentional harm to third persons.

(Citation omitted. Italics ours.) 187 Cal. App. 3d at 1290.

---

[7]However, the court reversed that part of the trial court's judgment dismissing plaintiff's statutory claim under Cal. Civ. Code § 1714.1(a), which imposes strict liability on parents for any act of "willful misconduct" by their minor child resulting in injury or death of another. 232 Cal. Rptr. at 640-42.

[8]The court also found it significant that the mother, lacking physical custody of her son at the time of the shooting, had no effective control of her son at that point. Thus, one of the prerequisites to imposing parental liability — ability to control the child — was lacking. *Robertson*, 232 Cal. Rptr. at 638-39.

In the present case, although Arthur had committed prior delinquent acts, none of them was of the same or similar nature as the shooting of Barrett. The three burglaries Arthur committed several months before the shooting involved a school and two vacant homes. His other crimes, attempted theft and vandalism, were also property crimes. Significantly, there is no evidence that Arthur was armed with any type of weapon when he committed any of the prior crimes. Thus, as in *Pesek* and *Robertson*, Arthur's prior delinquent behavior did not manifest a dangerous tendency to commit the violent assault against Barrett. Put another way, Arthur's prior crimes were not within the same zone of behavior that would put a reasonable parent on notice that his or her child might commit the tort or crime that injured the victim.

Nor did Arthur's other prior behavior, including the chimney incident, his night wanderings dressed and equipped as a Ninja, and his possession of Ninja weapons and books, presage his assault on Barrett. When Arthur caused a fire in the chimney, no one else was home, so the act posed no danger to any other person. The Pachecos claim they were not aware that Arthur had been sneaking out of the house through his window dressed and equipped as a Ninja. Even assuming they knew or should have known of this behavior, Arthur had not committed a violent act during any of these alleged episodes until he shot Barrett. Finally, while we do not condone the Pachecos' laxity in allowing Arthur to keep Ninja weapons, ammunition, and books on dangerous substances and explosives in his room, his possession of these items was also not enough to put his parents on notice that he would assault someone.[9]

---

[9]Barrett also seemingly argues that the Pachecos were negligent in permitting Arthur to own guns and in failing to hide them in a secure location. However, Arthur's parents required their son to complete a gun safety course and never saw him misuse a gun. Arthur's interest in and possession of guns did not make it foreseeable that he was likely to commit a violent act. Further,

Barrett points to Arthur's wall stickers[10] and the fact that he was in therapy as evidence of his "disturbed mind". While his stickers may well be construed as hostile, neither they nor the fact that he needed and was getting psychological treatment could have reasonably led his parents to conclude that he would violently assault another person.

Finally, Barrett argues that Rudolph Pacheco's statement, made after he learned that Arthur had shot Barrett, that he was "embarrassed but not surprised by the situation", is evidence of the father's awareness that his son had the propensity to commit a violent act. As the Pachecos argue, that statement is ambiguous. Rudolph could have been referring to the fact that Arthur had been wearing his Ninja outfit, that he had broken into his school, or that he had left the house through his bedroom window. Even assuming that Rudolph had been referring to the shooting, that statement alone, absent any other indication that Arthur had violent tendencies, was not enough to bring the issue before a jury.

In summary, none of Arthur's prior criminal acts or delinquent behavior demonstrate a "dangerous proclivity" that is within the same zone of behavior as the shooting of Barrett. We therefore hold that plaintiffs failed to establish the parental knowledge element of their negligent supervision claim.

Barrett also argues that the Pachecos failed to take reasonable measures to control Arthur's dangerous proclivity. In light of our holding that his prior behavior was insufficient to put his parents on notice of such a proclivity, we need not address the issue of whether the

---

Barrett has not argued that the Pachecos negligently entrusted Arthur with a firearm. Nor could he successfully make such an argument because the gun used to shoot Barrett was stolen and was not one of Arthur's or his parents' guns.

[10]The stickers read, "Enter Slowly, Leave Me Alone, I'm Having a Crisis", "Danger", "Beyond Repair" and "Life's A Bitch, Then You Die".

Pachecos took reasonable measures to prevent Arthur from injuring another person.

■ Barrett finally challenges the trial court's exclusion of evidence offered to prove that Arthur's mother had knowledge of prior behavior demonstrating his violent tendencies. While investigating the shooting incident, Detective Northrop interviewed Peg Tucker, the mother of 14-year-old Rich Tucker, about an incident in which Arthur allegedly sprayed mace in Rich's face while the boys were playing. On summary judgment, Barrett sought to introduce Detective Northrop's statement that Tucker had telephoned Arthur's mother after Tucker's son told her that Arthur had sprayed him. The trial court refused to admit the detective's statement on hearsay grounds.[11] Barrett contends that the statement, introduced for the purpose of showing that the Pachecos had notice of Arthur's violent propensity, was not hearsay and was therefore improperly excluded.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). The statement at issue was offered by someone other than the declarant: Detective Northrop. Northrop was not present when Tucker allegedly telephoned Mrs. Pacheco to report the incident. He therefore had no firsthand knowledge of the telephone call's substance. Further, the statement was offered to show that Mrs. Pacheco had knowledge of her son's violent tendencies. It was therefore offered for the truth of the matter asserted. Consequently, the detective's affidavit was hearsay and the trial court properly refused to consider it.

---

[11]Because the argument on the motion was not reported and the trial court's order does not indicate that it excluded Tucker's statement, we can only assume that the trial court excluded the evidence based on the parties' arguments in this court.

The summary judgment is affirmed.

COLEMAN and FORREST, JJ., concur.