777 N.W.2d 54 (2009)
279 Neb. 38
Virginia SINSEL, mother and next friend of Heidi Sinsel, a minor child, appellee and cross-appellant,
v.
Linda OLSEN, parent and next friend of Jacob Olsen, a minor child, and Jacob Olsen, appellants and cross-appellees.
No. S-09-003.
Supreme Court of Nebraska.
December 24, 2009.
*55 Betty L. Egan and Richard C. Gordon, of Walentine, O'Toole, McQuillan & Gordon, Omaha, for appellants.
Maren Lynn Chaloupka, of Chaloupka, Holyoke, Hofmeister, Snyder & Chaloupka, Scottsbluff, and Bryan S. McQuay, of Person & McQuay, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
PER CURIAM.

NATURE OF THE CASE
Virginia Sinsel, mother and next friend of Heidi Sinsel, sued the appellants, Jacob Olsen, a minor, and his mother, Linda Olsen. Sinsel claimed Jacob was negligent in throwing fireworks at Heidi and injuring her. She also claimed that Olsen was negligent in failing to supervise him. The district court overruled Olsen's motion for a directed verdict regarding Sinsel's claim of negligent supervision. The jury returned separate verdict forms, awarding Sinsel $50,000 for Jacob's negligence and $75,000 for Olsen's negligence.
The issues are whether the court erred in failing to (1) find, as a matter of law, that the evidence was insufficient to show Olsen's negligent supervision and (2) instruct the jury to allocate negligence between Olsen and Jacob for Heidi's noneconomic damages.

BACKGROUND

FACTS RELEVANT TO CLAIM OF JACOB'S NEGLIGENCE
On July 4, 2005, Jacob, who was then age 15, attended a fireworks display in Minden, Nebraska; Olsen did not accompany him. He brought his own fireworks and, at some point, threw fireworks toward a group of teenagers, injuring Heidi. Heidi was sitting in a golf cart with friends when she was struck by particles from the *56 fireworks that Jacob had thrown. The particles burned Heidi on her chest and neck. The injury left a small scar on her chest.

FACTS RELEVANT TO NEGLIGENT SUPERVISION CLAIM
To support her negligent supervision claim, Sinsel presented evidence of Jacob's behavior problems after his parents separated, his conflicts with Olsen, and Olsen's difficulty in controlling his behavior.
Jacob's parents separated in 2002, and divorced in 2004. During their separation, Olsen had custody of Jacob during the week. In January 2004, when he was age 13, the police responded to a call at a middle school basketball game because Jacob had displayed a pocketknife while engaging in name calling with students from another school. Olsen grounded Jacob for 2 weeks.
When Jacob was 14, his father cosigned on a loan so Jacob could purchase a pickup. Jacob paid for his pickup by working for his father's feedlot company. Olsen, however, did not allow Jacob to drive on his school driving permit unless she was with him because she was concerned that he would not drive safely or would drive to places other than school. But in August 2004, Jacob drove his pickup to school and had an accident in the parking lot. The other driver claimed that Jacob backed his pickup into her vehicle; he denied it. According to Jacob, the other vehicle had a scratched bumper and the police could not determine that he had backed his pickup into the other vehicle.
Olsen admitted that Jacob had been a rebellious teenager and made bad decisions. She and Jacob had had arguments over his behavior problems, some of which had become physical. In October 2004, Olsen confronted Jacob about driving his pickup to a place she had told him not to go, but he had left while she was still at work. When Olsen tried to take his keys away, he pushed or shoved her, causing her to fall and hit the back of her head. She got up and slapped him. Jacob went to his father's house, and his father called the police.
Later, in May 2005, one of Jacob's teachers wrote on his progress report that his behavior and attitude needed monitoring. Also, a teacher had previously told Olsen during a parent conference that Jacob had behavior problems. Olsen testified that she tried to monitor Jacob closely to make him behave, do his homework, and be at home. Jacob stated that Olsen made him do many chores.
Jacob testified that Olsen occasionally permitted him to go out alone. About a week before Heidi was injured, Olsen allowed Jacob to go out unsupervised for an hour or two. During this time, someone reported to the police that Jacob, while a passenger in another minor's vehicle, was throwing fireworks out the window into a residential yard. A police officer issued him a warning but did not contact Olsen. Olsen was not aware that Jacob had obtained fireworks or that he had thrown them into a residential yard until the night of July 4, 2005when officers came to her house to tell her Heidi had been burned.

PRETRIAL PROCEEDINGS AND JURY'S AWARDS
Before trial, the court sustained Sinsel's motion for partial summary judgment, finding that Jacob was negligent as a matter of law. It overruled Olsen and Jacob's motions for summary judgment. The court did not instruct the jury to allocate negligence between Olsen and Jacob. On separate verdict forms, the jury returned an award for Sinsel against Jacob for $50,000 and against Olsen for $75,000.

*57 ASSIGNMENTS OF ERROR
Olsen and Jacob assign, restated, that the court erred in overruling their motion for directed verdict on the negligent supervision claim, failing to properly instruct the jury on the allocation of negligence, and entering judgment on an excessive verdict.
On cross-appeal, Sinsel assigns that the court erred in assessing prejudgment interest using the rate in effect on the day of the judgment.

STANDARD OF REVIEW
A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.[1]
Whether a jury instruction is correct is a question of law, which we independently decide.[2]

ANALYSIS

JACOB'S NEGLIGENCE WAS NOT REASONABLY FORESEEABLE
Under the Restatement (Second) of Torts,[3] the parent-child relationship is a special relationship that can require parents in some circumstances to control the conduct of their child.
Section 315 of the Restatement provides:
There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
(b) a special relation exists between the actor and the other which gives to the other a right to protection.[4]
The parent-child relation is a special relationship under § 315(a).[5] Section 316 of the Restatement provides:
A parent is under a duty to exercise reasonable care so to control his minor child as to prevent it from intentionally harming others or from so conducting itself as to create an unreasonable risk of bodily harm to them, if the parent
(a) knows or has reason to know that he has the ability to control his child, and
(b) knows or should know of the necessity and opportunity for exercising such control.[6]
Relying on these provisions, we concluded in Popple v. Rose,[7] that a parent can have a duty to warn third persons of their child's past conduct to protect them from harm in limited situations. But we recognized that parents are not liable for failing to control their children's conduct to prevent injury to others in the same way owners are responsible for harboring a vicious animal. And we specifically stated that courts have "refused to impose liability in situations where the child was generally incorrigible, heedless, or vicious."[8] *58 We held that parents can be liable for failing to exercise reasonable care to prevent injury to others only when their child has a dangerous habit of causing harm to others and the parents know of the child's "habitual, dangerous propensity."[9] In contrast, parents are not liable for negligent supervision where the record lacks any evidence indicating the parents were aware the child was prone to commit the particular act or course of conduct which led to the plaintiff's injury.[10]
In Popple, the evidence showed that the parents knew their son had a history of physically violent behavior. But they did not know he had a habitual propensity to commit a sexual assault or sexual abuse. We concluded that the parents had no duty to warn of an unknown dangerous sexual propensity. This reasoning tracks the comments to the Restatement's § 316 and decisions from other jurisdictions.
Comment a. to § 316 provides that parents are responsible for their child's conduct if they have the ability to control it.[11] But comment b. clarifies that
[t]he duty of a parent is only to exercise such ability to control his child as he in fact has at the time when he has the opportunity to exercise it and knows the necessity of so doing. The parent is not under a duty so to discipline his child as to make it amenable to parental control when its exercise becomes necessary to the safety of others.[12]
So parents who have the ability to restrain or correct their child have a duty to do so when their child's conduct is posing an obvious danger to others in their presence. And we recognize that some courts have held that parents can be liable for failing to take steps to correct or restrain a child's conduct when they know the child has a dangerous habit that is likely to cause injury to others.
For instance, in Popple,[13] we discussed a case in which the father knew his 7-year-old child habitually struck other children in the face with a stick but had encouraged, rather than restrained, this behavior, thus condoning the act.[14] We discussed another case in which the court held that the parents could be liable for failing to warn a babysitter that their 4-year-old child had a habit of violently attacking and throwing himself against other people.[15] But we did not apply this line of cases in Popple because the plaintiff could not show foreseeability: the parents did not know of any dangerous sexual propensity. Consistent with our discussion in Popple, other courts have generally held that the child must have a habit of wrongdoing which gives the parent reason to know with some specificity of a present opportunity and need to restrain the child to prevent some imminently foreseeable harm.[16]
For example, the Alaska Supreme Court affirmed summary judgment for the parents against a negligent supervision claim. There, the defendant's 17-year-old son murdered two other boys with a stolen gun *59 during a verbal altercation.[17] The boy had been emotionally disturbed since childhood, and when he was 15, he had shot another boy in the hand with a stolen gun and been placed on probation. Five months before the murders, but unknown to his parents, he and his friends had beaten another boy with a bat and a cane at a party. But at the time of the murders, the evidence showed nothing that should have led the parents to foresee a specific need to keep their son from hurting someone.
The court noted that many courts have recognized that parents have diminished ability and opportunity to control the conduct of their older children. It agreed that parents could have an opportunity to control a child even if they were not present at the precise moment that a tort occurs. And it agreed that the parents were on general notice of the child's dangerous propensities. But it held that a plaintiff must show more than the parents' general knowledge of a child's dangerous propensity.[18]
Here, Jacob's past rebellious conduct did not show a habitual dangerous propensity that would have put Olsen on notice that Jacob would throw fireworks at others. And clearly, a child's "fender bender" in a school parking lot would not alert parents that their child might negligently harm others with fireworks. Similarly, Olsen's physical altercation with Jacob in October 2004 was in response to her attempt to discipline him by taking away his pickup. This altercation did not indicate that Jacob might negligently harm others if permitted to attend a fireworks display. We agree that Jacob's display of a pocketknife in the 2004 dispute with other students who had called him names exhibited poor judgment. But it was not indicative of the conduct that injured Heidi.
We conclude that all of the previous incidents of Jacob's misconduct failed to show that Jacob had a dangerous, habitual propensity that made his throwing fireworks at Heidi imminently foreseeable. We hold that Olsen did not have a duty to confine him to the house to prevent an unforeseeable act. To hold otherwise would require parents to pull an unending 24-hour guard duty because of their child's past incorrigible or careless behavior. Sinsel points us to no case holding that parents have this duty, and such a rule would be neither reasonable nor consistent with the Restatement's comments. Although Jacob's conduct the week before the fireworks display indicated that he would obtain fireworks without permission and could not be trusted to responsibly use them, the evidence showed that Olsen did not know of his earlier conduct before July 4, 2005. We conclude that the district erred in failing to direct a verdict for Olsen on Sinsel's claim of negligent supervision.

THE COURT ERRED IN FAILING TO INSTRUCT JURY TO ALLOCATE FAULT
As noted, the court did not instruct the jurors to allocate negligence between Olsen and Jacob. Instead, the court gave the jurors separate verdict forms for Olsen and Jacob. On the first form, they found "for the plaintiff and against the defendant Linda Olsen and assess damages at *60 $75,000.00." On the second form, they found "for the plaintiff and against the defendant Jacob Olsen and assess damages at $50,000."
Olsen argues that the court erred in failing to instruct the jury to allocate negligence between Olsen and Jacob. Sinsel argues that Olsen did not object to the jury instructions or offer an alternative.
Because we have concluded that a verdict should have been directed for Olsen, whether the jury was properly instructed regarding allocation of damages may, at first glance, appear moot. But we conclude that we must examine this issue to determine the effect of our holding with respect to Olsen on both Sinsel and Jacob.
The elements of damage submitted to the jury included Heidi's alleged past and future disfigurement, pain, and suffering. Under Nebraska's comparative negligence statutes, these constitute "noneconomic damages." Where, as here, there was no claim that multiple defendants acted as a part of a common enterprise or plan,
the liability of each defendant for noneconomic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of noneconomic damages allocated to that defendant in direct proportion to that defendant's percentage of negligence, and a separate judgment shall be rendered against that defendant for that amount.[19]
This provision contemplates a process by which the finder of fact determines the total noneconomic damages suffered by the plaintiff as the result of injuries proximately caused by the negligence of multiple defendants; then, it allocates a portion of the total to each defendant "in direct proportion to that defendant's percentage of negligence."[20]
In this case, however, the court instructed the jury to determine the "nature and extent" of damages caused by the negligence of each named defendant without reference to the total noneconomic damages sustained by Heidi or the "percentage of negligence" attributable to Jacob and Olsen. Thus, we cannot conclude from the record that the jury determined the total damages to be $125,000, the sum of its verdicts against Jacob and Olsen, and we do not reach the issue of whether a verdict in this amount would be excessive. We note, however, that in denying the motion for new trial, the district court expressed concern that portions of Sinsel's closing argument, to which no objection was made, "appealed to passion and prejudice of the jury rather than reason and logic." We share that concern.
But the record does establish that the jury found Heidi's damages to be at least $50,000, for which it found Jacob liable, and we conclude that this amount is not excessive. Having established her entitlement to a judgment for $50,000, fairness requires that Sinsel should have an opportunity to accept it in satisfaction of her claim as an alternative to a new trial.[21] Accordingly, we remand the cause and direct that Sinsel shall have 10 days from the spreading of the mandate in the district court to file acceptance of a remittitur for all amounts in excess of $50,000. If that occurs, the judgment shall draw interest from the date the remittitur is accepted. If Sinsel does not elect to accept the remittitur, the district court shall conduct *61 a new trial limited to determining the nature, extent, and amount of Heidi's damages caused by Jacob's negligence.
We also vacate the award of prejudgment interest and do not reach the issues raised by the cross-appeal, because at this point, Sinsel has not obtained a judgment exceeding her pretrial settlement offer pursuant to Neb.Rev.Stat. § 45-103.02 (Reissue 2004).

CONCLUSION
We reverse and vacate the judgment against Olsen and the award of prejudgment interest and remand the cause for further proceedings consistent with this opinion regarding Sinsel's claim against Jacob.
REVERSED AND VACATED IN PART, AND CAUSE REMANDED FOR FURTHER PROCEEDINGS.
NOTES
[1] Aon Consulting v. Midlands Fin. Benefits, 275 Neb. 642, 748 N.W.2d 626 (2008).
[2] See Karel v. Nebraska Health Sys., 274 Neb. 175, 738 N.W.2d 831 (2007).
[3] See Restatement (Second) of Torts § 315 (1965).
[4] Id. at 122.
[5] See id., comment c.
[6] Restatement, supra note 3, § 316 at 123-24.
[7] Popple v. Rose, 254 Neb. 1, 573 N.W.2d 765 (1998).
[8] Id. at 9, 573 N.W.2d at 770.
[9] See id. at 10, 573 N.W.2d at 771.
[10] See id.
[11] Restatement, supra note 3, § 316, comment a.
[12] Id., comment b. at 124.
[13] Popple, supra note 7.
[14] See Norton v. Payne, 154 Wash. 241, 281 P. 991 (1929).
[15] See Ellis v. D'Angelo, 116 Cal.App.2d 310, 253 P.2d 675 (1953). See, also, Condel v. Savo, 350 Pa. 350, 39 A.2d 51 (1944).
[16] See, Dinsmore-Poff v. Alvord, 972 P.2d 978 (Alaska 1999); Gissen v. Goodwill, 80 So.2d 701 (Fla.1955); Norton, supra note 14.
[17] See Dinsmore-Poff, supra note 16.
[18] Accord, e.g., Parsons v. Smithey, 109 Ariz. 49, 504 P.2d 1272 (1973); Barth v. Massa, 201 Ill.App.3d 19, 558 N.E.2d 528, 146 Ill. Dec. 565 (1990); Wells v. Hickman, 657 N.E.2d 172 (Ind.App.1995); Barrett v. Pacheco, 62 Wash.App. 717, 815 P.2d 834 (1991); Nielsen v. Spencer, 287 Wis.2d 273, 704 N.W.2d 390 (Wis.App.2005).
[19] Neb.Rev.Stat. § 25-21,185.10 (Reissue 2008). See, also, Lackman v. Rousselle, 257 Neb. 87, 596 N.W.2d 15 (1999).
[20] § 25-21,185.10.
[21] See, Kirby v. Liska, 217 Neb. 848, 351 N.W.2d 421 (1984); McMillan Co. v. Nebraska E. G. & T. Coop., Inc., 192 Neb. 744, 224 N.W.2d 184 (1974).