Donna DINSMORE–POFF, Appellant,

v.

Louis and Tina ALVORD, Appellees.

No. S–7935.

Supreme Court of Alaska.

Feb. 5, 1999.

W. David Weed, Law Offices of W. David Weed, Anchorage, and LeRoy E. DeVeaux, DeVeaux and Associates, P.C., Anchorage, for Appellant.

Rod R. Sisson, Crosby & Sisson, P.C., Anchorage, for Appellees.

Before MATTHEWS, Chief Justice, and COMPTON, EASTAUGH, FABE and BRYNER, Justices.

## OPINION

COMPTON, Justice.

### I. INTRODUCTION

This appeal presents two novel questions. The first is whether we should adopt § 316 of the Restatement (Second) of Torts, which makes parents liable for negligently failing to

prevent their children from intentionally harming others. The second concerns the plaintiff's burden under § 316 of showing that a parent unreasonably failed to recognize a need to control his or her child, or did recognize such a need, but failed to make a reasonable attempt to meet it. The question is how specific and immediate the need to control the child must be to support liability.

The mother, sister, child, and estate of Mickey Robert Dinsmore II (collectively, Dinsmore[1]) sued various people to redress Dinsmore's murder by seventeen-year-old Brian Hall. These included Hall's mother and stepfather, Tina and Louis Alvord, on a theory of negligent supervision. The Alvords were well aware of Hall's long history of emotional disturbance and violence, and of his arrest twenty-one months earlier for shooting a boy. Nonetheless, they did not enforce a curfew or regularly search his personal effects. Dinsmore, on the other hand, presented no evidence that, at the time of the murder, the Alvords knew that Hall had a gun or had done anything violent in the past twenty-one months, or that they should have known that any specific recent event or plan of Hall's required them to intervene to prevent likely harm. We conclude that the superior court correctly applied § 316 to these facts in granting the Alvords summary judgment, and affirm.

## II. FACTS AND PROCEEDINGS

Brian Hall was born in 1975. The parties do not dispute that, from early childhood, he was emotionally disturbed and prone to uncontrollable anger and violence. From age three onward his parents—and sometimes the State, with their consent—put him in numerous psychiatric treatment facilities and alternative school programs for emotionally disturbed children, in and out of Alaska. He attended the Whaley Center, Anchorage's most restrictive school program, which is equipped with padded cells to hold uncontrollable students. He was hospitalized four times at the Alaska Psychiatric Institute (API) between the ages of eleven and twelve because of fighting and, once, threatening or assaulting his mother with scissors. API personnel put him in four-point restraints at least once. During the 1990–91 school year, both West High School and a vocational high school expelled him for fighting.

In July 1991, at age fifteen, Hall was adjudicated a delinquent on a charge of misconduct involving a weapon. He had shot a boy in the hand with a stolen pistol. Hall and a friend had approached and talked to two girls sitting in a car at an intersection at night; a large group of boys who knew the girls, and some of whom had bats, accosted and threatened Hall and his friend. Hall shot one. As reported by the police and by Hall's juvenile probation officer, Paul Kelson, the shooting involved a notable element of self-defense.

Hall was put on probation and, after about a month in a shelter, returned to live with the Alvords in October 1991. Everyone felt that he did well on probation: He was a model resident at the shelter and, once at home, kept his appointments with Kelson, did well at a computer-assisted alternative classroom program and a drug education and awareness program, paid his restitution, and became a trusted employee at a janitorial firm. He had conflicts with his parents about piercing his nose, drinking alcohol, possibly using marijuana, and having a girl in the house, but he, they, and Kelson resolved the conflicts. There were no reports of violence. During Hall's probation, the Alvords fully cooperated with Kelson, who found them caring and supportive. Kelson moved to end the probation ten months early, in October 1992. Lou Alvord expressed concern about how Hall would act after his probation ended, but he and Tina supported Hall's release from probation.

Neither Kelson nor the Alvords then knew that on Halloween—while the court was processing Hall's release from probation—he and one or more of his friends had used a cane and a bat to beat another boy at a party. Hall's parents only learned of the assault after his arrest for murder.

1. Only Donna Dinsmore–Poff, Mickey's mother, has appealed. For simplicity and consistency, however, we refer to "Dinsmore" in discussing both the trial court proceedings and the appeal.

Brian Hall murdered Mickey Dinsmore and Stanley Honeycutt with a stolen gun in the early-morning hours on April 16, 1993. Dinsmore and Honeycutt were riding in a car in Anchorage's Far North Bicentennial Park. They had a verbal altercation with Hall and his companions, who were in a car driven by a friend of Hall's. Dinsmore and Honeycutt were unarmed. Hall was seventeen and a half. After an extensive juvenile waiver hearing, Hall was tried as an adult and convicted of first-degree murder for shooting Dinsmore.

Dinsmore's relatives and estate filed a wrongful-death suit against Hall; his companions; the parents who owned the car they were in; the Municipality of Anchorage and its Police Department; Paul Kelson; the State Division of Youth Corrections; and the Alvords. After the court dismissed a "vicarious liability" claim against the Alvords, Dinsmore amended the complaint to allege negligent supervision.

The Alvords submitted much of the juvenile-waiver-hearing transcript as evidence; Dinsmore submitted only some material whose inadmissibility we note in the margin,[2] and Kelson's testimony about the Halloween battery. Applying section 316 of the Restatement (Second) of Torts (§ 316), the court granted the Alvords summary judgment. Dinsmore unsuccessfully moved for reconsideration, attaching evidence that, as we note in the margin, is irrelevant to this appeal.[3] The Alvords successfully moved the court under Alaska Civil Rule 54(b) to make the summary judgment final, though other defendants remained in the case. Dinsmore appeals the summary judgment and the entry of final judgment.

## III. DISCUSSION

### A. Standard of Review

We review summary judgments de novo, drawing all reasonable inferences in the nonmovant's favor.[4] If there are no genuine factual disputes—and Dinsmore does not claim that there are—we must decide whether the undisputed facts entitle the movant to judgment as a matter of law.[5] We also decide questions of law—such as whether to adopt § 316—de novo, choosing the rule that best reflects reason, policy, and precedent.[6] We review a grant of final judgment under Rule 54(b) for abuse of discretion.[7]

### B. We Decline to Address Adoption of § 316 as Alaska Law.

Both parties recommend that we adopt § 316, and the superior court predicted that we would. Section 316 requires parents who know of their children's violent propensities to keep them from harming others, by imposing

a duty to exercise reasonable care so to control [one's] minor child as to prevent it from intentionally harming others or from

---

2. The State's closing argument in Hall's juvenile-waiver hearing is not admissible to oppose summary judgment under Alaska Civil Rule 56(e). See Jennings v. State, 566 P.2d 1304, 1310 (Alaska 1977) (holding that "allegations of fact made by counsel in oral argument do not satisfy ... Rule 56(e)") (citing 10 Charles Wright & Arthur Miller, Federal Practice & Procedure § 2723, at 488–90 (1973)). Nor are the police reports that Dinsmore filed without affidavit. See, e.g., French v. Jadon, Inc., 911 P.2d 20, 24 (Alaska 1996) ("[H]earsay statements that would be inadmissible at trial are inadmissible in a motion for summary judgment."); Alaska R. Evid. 803(8)(b)(i) (specifying that "investigative reports by police" are not within the public-records exception to hearsay rule).

The parties dispute whether the superior court, in ruling on the Alvords' summary-judgment motion, was bound to consider evidence that neither Dinsmore nor the Alvords had submitted or mentioned, but that two other defendants had made

part of the record in the case. We need not address those arguments, however, for Dinsmore has not pointed to anything in the disputed material that would lead us to reverse the judgment.

3. Dinsmore first filed parts of the Alvords' depositions with a motion for reconsideration and, leaving aside the impropriety of filing new evidence with a motion for reconsideration, Dinsmore has not appealed the denial of that motion.

4. See, e.g., Maddox v. River & Sea Marine, Inc., 925 P.2d 1033, 1035 (Alaska 1996).

5. See id.

6. See, e.g., Bolieu v. Sisters of Providence in Wash., 953 P.2d 1233, 1235 (Alaska 1998) (deciding whether to impose duty).

7. See, e.g., Williams v. Mammoth of Alaska, Inc., 890 P.2d 581, 586 (Alaska 1995).

so conducting itself as to create an unreasonable risk of bodily harm to them, if the parent

(a) knows or has reason to know that [the parent] has the ability to control [the] child, and

(b) knows or should know of the necessity and opportunity for exercising such control.[8]

This rule encodes a principle that courts in numerous states have applied in many cases since at least the early twentieth century.[9]

Not all courts embrace § 316. Three state supreme courts in the last two decades have squarely declined to adopt § 316, and an intermediate appellate court in a fourth state partly did so.[10] Interestingly, the cases in which courts have declined to adopt § 316 have involved teenaged children and serious crimes like rape or murder.[11] As our discussion in Part III.C.1 shows, many § 316 cases—though by no means all—have involved young children and less serious assaults. The opinions rejecting § 316 may thus reflect at least in part a judicial disinclination to hold parents liable for being unable to stop serious delinquency in older children. One court asked rhetorically whether § 316 should "apply to all minor children regardless of age, even though parental control diminishes as the child matures?" [12]

We appreciate the concerns expressed both by those courts which have adopted and by those which have rejected § 316. The parties have agreed that § 316 is the law of the case; thus they have made the determi- nation that § 316 should apply to the dispute between them. In view of their agreement, we see no need either to adopt or reject § 316. The issue must slumber until awakened by parties who present us with adversarial expressions of "reason, policy, and precedent" for or against adoption of § 316.

C. *Dinsmore Failed to Rebut the Alvords' Showing that They Were Entitled to Judgment under § 316 as a Matter of Law.*

We consider the Alvords' entitlement to judgment as a matter of law first in light of out-of-state § 316 precedents and, ultimately, by analyzing independently how best to apply its rule.

1. *Case law from other states offers no support for finding parents liable on the facts of this case.*

The text of § 316 suggests a three-part test: i.e., whether parents knew or should have known of the (1) need, (2) ability, and (3) opportunity to control their child. Case law from other states, however, does not bear this out. Instead, courts first ask if parents knew of past conduct enough like that at issue to put them on notice of the need to correct their child's dangerous propensity. Courts resolve most cases in the parents' favor upon finding no such past misconduct or, at least, no parental knowledge thereof.[13] But the Alvords cannot dispute that they knew of Hall's propensity for violence, including a prior assault with a stolen gun.

---

8. Restatement (Second) of Torts § 316 (1966).

9. See § 316, Reporter's Notes at 21–24 (collecting pre-1966 cases); Wade R. Habeeb, Annotation, *Parents' Liability for Injury or Damage Intentionally Inflicted by Minor Child*, 54 A.L.R.3d 974, 992–1008 (§ 10[a]-[b] ) (1993 & Supp.1997) (collecting cases).

10. See *Lanterman v. Wilson*, 277 Md. 364, 354 A.2d 432, 436 (1976); *J.L. v. Kienenberger*, 257 Mont. 113, 848 P.2d 472, 475–76 (1993); *Rodriguez v. Spencer*, 902 S.W.2d 37, 43 (Tex.App. 1995) (finding " § 316's analysis helpful" but not adopting it, instead apparently limiting liability to parents who actually know—not just *should* know—of danger); *Bell v. Hudgins*, 232 Va. 491, 352 S.E.2d 332, 334 (1987).

11. See *Lanterman*, 354 A.2d at 433 (19–year–old, burglary); *Kienenberger*, 848 P.2d at 474 (13–year–old, rape); *Rodriguez*, 902 S.W.2d at 39–40 (17–year–old, hate-crime murder); *Bell*, 352 S.E.2d at 333 (16–year–old, assault and attempted rape).

12. *Bell*, 352 S.E.2d at 334.

13. See, e.g., *Robertson v. Wentz*, 187 Cal.App.3d 1281, 232 Cal.Rptr. 634, 638 (1986); *Gellner v. Abrams*, 194 Ga.App. 455, 390 S.E.2d 666 (1990); *Brahm v. Hatch*, 203 A.D.2d 640, 609 N.Y.S.2d 956, 958 (1994). At least 20 case summaries appended to § 316 and/or to the A.L.R. annotation cited in note 9, *supra*, show that this is the most common conclusion to this sort of claim.

Most courts, upon finding parental knowledge of past misconduct, have not then made a demanding, detailed inquiry. They have usually just asked if the parents made some reasonable effort to prevent a recurrence. One can divide reported cases in which parents knew of past violence into those: (a) reversing Rule 12(b)(6) dismissals (or their equivalent) upon taking as true allegations that parents knew of, yet did absolutely nothing to correct, and even encouraged, a violent tendency;[14] (b) finding parents liable, or reversing nonsuits in their favor, based not on allegations but on evidence; (c) exonerating parents who made adequate disciplinary efforts; and (d) exonerating parents who had no chance to prevent the harm.

All but one of the cases that Dinsmore cites are from group (a). They only reverse dismissals for failure to state a claim upon accepting allegations that parents did nothing to correct—or even encouraged—a child's misconduct.[15] These opinions offer scant guidance beyond the Rule 12(b)(6) stage; they only show that a court accepts the rule of § 316. The opinions in group (b), finding parents liable, are distinguishable. Those in group (c), finding adequate discipline, show that courts have been far from demanding in judging the reasonableness of parental efforts to correct a vicious tendency. And two opinions in group (d), which rely partly on inability to control a child at the time of a crime, absolve parents in the cases most like this one.

The one opinion Dinsmore cites that does not rely only on allegations that the parents did nothing to control their child is *Singer v. Marx*, 144 Cal.App.2d 637, 301 P.2d 440 (1956), in which an appellate court reversed a nonsuit taken after all evidence. That evidence showed that the mother of nine-year-old Tim Marx, who hit a girl in the eye with a rock, knew that he had been throwing rocks at people, houses, and cars for over a year.[16] Two people testified that they had complained to her. She testified that, after the second complaint, she had made Tim repeatedly write, "I will not throw pebbles."[17] But he still did, leading the court to note that efforts to control his conduct had failed. Finding it "fairly inferable that Mrs. Marx had notice of Tim's dangerous proclivities and did not administer effective discipline," the court held that a jury could reasonably find her—but not her husband Zeppo, who did not know of the problem—liable.[18]

*Marx* yielded the result that Dinsmore seeks: The court found a jury question in whether parental efforts to correct a child's violent misconduct had been reasonable. And in so doing, the court relied on the fact that the misconduct had continued after the parents' efforts to correct it. But *Marx* is readily distinguishable, for it involved a young boy engaged in relatively minor, childish misconduct. Making a nine-year-old stop throwing rocks is a much less daunting task than keeping a seventeen-year-old from secretly carrying and using a stolen gun. At least three courts have followed the authors of § 316 in noting "the modern view . . . that the very youth of [a] child is likely to give [a] parent more effective ability to control [its]

**14.** An archetypal example is *Mitchell v. Wiltfong,* 4 Kan.App.2d 231, 604 P.2d 79, 80, 82 (1979), in which the court of appeals found a viable complaint upon accepting as true allegations that child repeatedly beat other children and that parents not only did nothing to discipline but "incited" and "encouraged" him. *See also Ryley v. Lafferty,* 45 F.2d 641, 642 (D.Idaho 1930); *Bieker v. Owens,* 234 Ark. 97, 350 S.W.2d 522 (1961); *Poncher v. Brackett,* 246 Cal.App.2d 769, 55 Cal.Rptr. 59 (1966); *Ellis v. D'Angelo,* 116 Cal.App.2d 310, 253 P.2d 675, 679–80 (1953); *Caldwell v. Zaher,* 344 Mass. 590, 183 N.E.2d 706, 707 (1962); *Linder v. Bidner,* 50 Misc.2d 320, 270 N.Y.S.2d 427, 430 (1966); *Zuckerberg v. Munzer,* 277 A.D. 1061, 100 N.Y.S.2d 910 (1950); *Condel v. Savo,* 350 Pa. 350, 39 A.2d 51, 52–53 (1944); *Seaman v. Hockman,* 2 Pa. D. & C.2d 663, 54 A.L.R.3d 974, 999 (1953); *Bocock v. Rose,* 213 Tenn. 195, 373 S.W.2d 441 (1963).

**15.** *See Ryley,* 45 F.2d at 642; *Bocock,* 373 S.W.2d at 445; *Bieker,* 350 S.W.2d at 526; *Caldwell,* 183 N.E.2d at 707; *Seaman,* as summarized at 54 A.L.R.3d at 999; *Condel,* 39 A.2d at 53. Some of the older opinions technically reverse orders sustaining demurrers, rather than orders of dismissal for failure to state a claim, but the two are functionally equivalent.

**16.** *See Singer v. Marx,* 144 Cal.App.2d 637, 301 P.2d 440, 444–45 (1956).

**17.** *Id.* at 445.

**18.** *Id.*

actions," [19] or the corollary view that it is harder to control a near-adult child.[20]

The few other opinions in group (b) (affirming liability or reversing nonsuits based on evidence) are also distinguishable: one involved only a duty to warn; [21] two involved failure to control very young children misbehaving in a custodian's immediate presence; [22] and two involved failure to do anything to address recent misconduct.[23] Given the Alvords' active cooperation with Hall's probation, the rules over which he fought with them, and the many programs and facilities into which his mother diligently placed him, one cannot possibly describe them as having done nothing to respond to his misconduct.

The few opinions besides *Marx* in group (c), evaluating whether parental efforts were reasonable, suggest that a good-faith attempt to correct misconduct as it occurs is enough.[24] In *Ross v. Souter*, 81 N.M. 181, 464 P.2d 911 (App.1970), for example, the court affirmed dismissal of a suit against parents who had known of their boy's tendency to fight before his punch ruined plaintiff's son's orthodontia.[25] The court found adequate evidence of a "reasonable effort to correct or restrain" the boy in his principal's testimony that the boy's mother had helped discipline him for fighting, had reprimanded him in the principal's office, and had been "sincere in trying to get [him] to stop this fighting." [26] *Ross* and the opinions cited in note 24 absolve parents after cursorily noting evidence of good-faith efforts to correct young children by admonition. To the extent such cases are relevant in this more grave context, they do not support the searching inquiry into alternate disciplinary regimes that Dinsmore urges.

We consider finally group (d)—cases turning at least in part on whether parents knew of an opportunity or need to control a child, or whether they were able to do so. Dinsmore stresses her view that parents need not be immediately present at the moment of a tort to be liable for failing to control their child. Reading literally Judge Hunt's com-

**19.** Section 316, cmt. c (quoted in *Jarboe v. Edwards*, 26 Conn.Supp. 350, 223 A.2d 402, 404 (1966) (affirming verdict against parents whose four-year-old son stuffed paper in child's pants and set it afire, as parents had despaired of ending his fascination with fire, yet did not monitor play or keep him from matches)).

**20.** *See Moore v. Crumpton*, 306 N.C. 618, 295 S.E.2d 436, 442 (1982) ("The opportunity to control a young man of this age [seventeen and a half] obviously is not as great as with a younger child."); *cf. Bell*, 352 S.E.2d at 334 (noting, in declining to adopt § 316, that "parental control diminishes as the child matures").

**21.** *See Nieuwendorp v. American Family Ins. Co.*, 191 Wis.2d 462, 529 N.W.2d 594, 597, 602 (1995) (affirming verdict against parents of hyperactive nine-year-old who, resisting discipline, hurt teacher, but stressing that parents would not be liable had they only warned school when they stopped son's behavior-controlling medication).

**22.** *See Costello v. Hart*, 23 Cal.App.3d 898, 100 Cal.Rptr. 554 (1972); *Duncan v. Rzonca*, 133 Ill.App.3d 184, 88 Ill.Dec. 288, 478 N.E.2d 603 (1985).

**23.** *See Eldredge v. Kamp Kachess Youth Servs., Inc.*, 90 Wash.2d 402, 583 P.2d 626, 630 (1978) (en banc) (affirming verdict against program for troubled youth from which three boys ran away, stealing and damaging a car, and which, when the boys were returned after ten days, reassigned them to the same unguarded facility, whence they again escaped three days later, stealing and damaging another car, because record was "devoid of evidence indicating [any] increased supervision of the boys during the 3 days" after their return); *Norton v. Payne*, 154 Wash. 241, 281 P. 991, 992–93 (1929) (reversing nonsuit taken after evidence because mother had testified that father not only had not tried to restrain daughter, but had actually *encouraged* her in habit of hitting other children with sticks).

**24.** *See, e.g., Horton v. Reaves*, 186 Colo. 149, 526 P.2d 304, 307 (1974) (en banc) (affirming dismissal of claim against mother whose young sons dropped an unattended infant they found in bed, where infant's mother testified that, when defendant's children had once before pushed a child off a bed, defendant had "reprimanded her children for this behavior ... indicat[ing] that [she] exercised due care in watching over [her sons]."); *Zuckerbrod v. Burch*, 88 N.J.Super. 1, 210 A.2d 425, 426 (App.1965) (affirming dismissal in case in which five-year-old threw a rod into a child's eye because, when he had thrown things at others, his mother "had spoken to him on several occasions ... [and told him] 'he shouldn't throw things.' ").

**25.** *Ross v. Souter*, 81 N.M. 181, 464 P.2d 911, 913–14 (App.1970).

**26.** *Id.* at 104, 464 P.2d at 914.

ments that the Alvords "were not present at the shooting" and "did not have the opportunity or know of the necessity ... [or] have the ability to control Hall's actions at the time of the shooting," Dinsmore sets up and knocks down a straw man. Dinsmore portrays the court's holding as follows: "[S]ince the Alvords ... were not present at the murders, they could not, as a matter of law, be held responsible."[27] But the Alvords do not argue that parents must be physically present to be liable. They argue that § 316 only requires parents to exercise the ability to control a child that they have at the time of the tort, and only at such time as they should know of a specific need and opportunity to do so. That need not mean the precise instant of the tort.

Two Illinois opinions address in their holdings how narrowly to define the opportunity, ability, and need to control a child.[28] In *Cooper v. Meyer,* 50 Ill.App.3d 69, 7 Ill.Dec. 916, 365 N.E.2d 201 (1977), Cooper went to Meyer's home to complain about one of Meyer's children, but another of Meyer's sons flew into a rage and attacked Cooper.[29] The court assumed that Meyer knew of his son's violent propensity. It held that he had nonetheless "had no opportunity to directly control the ... child at the time of the tort"[30] and no chance to warn Cooper. He had not invited or expected her visit, unlike the parents in a California case who failed to warn a babysitter that their child was violent.[31]

In *Barth v. Massa,* 201 Ill.App.3d 19, 146 Ill.Dec. 565, 558 N.E.2d 528 (1990), the Illinois court resolved one of the two reported cases somewhat similar to this one. Fifteen-year-old Michael Massa's parents knew that he had misused BB guns at least once, firing at other children, yet they had failed or refused to get him counseling.[32] Michael bought some stolen guns and kept them in his room; two weeks later, he and a friend broke into a store to steal ammunition and, when police fired at them as they fled, Michael shot and injured Officer Barth.[33] Barth sued, and the appellate court ultimately held the Massas were entitled to a directed verdict.[34]

The court held that the BB-gun incidents could not "reasonably be interpreted as putting the Massas on notice that Michael was likely to buy a stolen gun, commit a burglary, and shoot a police officer," and, in the alternative, that there was "no evidence of the opportunity to prevent the shooting."[35] It quoted from the commentary to § 316, which says that a parent is bound "only to exercise such ability to control his child as he in fact has at the time when he has the opportunity to exercise it and knows the necessity of so doing."[36] It noted that, even if the Massas were on general notice that Michael tended to misuse guns, nothing suggested that they knew that

> when Michael left the house on October 3, 1981, he planned to break into a sporting goods store. Nor was there any evidence from which it could reasonably be inferred that they knew Michael was armed when he left the house that day. Absent some evidence that the Massas knew or should have known of the necessity and opportunity to control Michael's conduct on that day, there can be no liability.[37]

27. "[T]he Superior Court interpreted the 'opportunity to control' to be tantamount to the parent being present at the exact spot, time and place, where the minor child commits the tort." *See* Appellant's Brief at 21.

28. *Cf. Campbell v. Haiges,* 152 Ill.App.3d 246, 105 Ill.Dec. 331, 504 N.E.2d 200, 203 (1987) (*dictum*) (implying narrow definition of ability to control child).

29. *See Cooper v. Meyer,* 50 Ill.App.3d 69, 7 Ill. Dec. 916, 365 N.E.2d 201, 202 (1977).

30. *Id.*

31. *See id.* 365 N.E.2d at 203, 7 Ill.Dec. 916 (distinguishing *Ellis v. D'Angelo,* 116 Cal.App.2d 310, 253 P.2d 675, 679–80 (1953)).

32. *See Barth v. Massa,* 201 Ill.App.3d 19, 146 Ill.Dec. 565, 558 N.E.2d 528, 531 (1990).

33. *See id.* 558 N.E.2d at 530–31, 146 Ill.Dec. 565.

34. *See id.* at 535, 146 Ill.Dec. 565.

35. *Id.* at 534, 146 Ill.Dec. 565.

36. *Id.* (quoting § 316, cmt. b.).

37. *Id.* (citing *Cooper,* 365 N.E.2d at 203, 7 Ill. Dec. 916).

In *Moore v. Crumpton*, 306 N.C. 618, 295 S.E.2d 436 (1982), North Carolina's Supreme Court affirmed summary judgment for the father of seventeen-year-old John Crumpton Jr., who late one night got very drunk, left home, and raped Ms. Moore at knife point. Applying the rule of § 316,[38] the court held that John Jr.'s father had not known of his dangerous propensity and, in the alternative, that the father had not had the ability or opportunity to control his son at the time of the rape.[39]

John Jr. began to use drugs, argue with his parents, and skip school before he turned thirteen.[40] The court noted without elaboration that he had been "arrested for carrying a concealed knife"[41] and "involved in an assault ... with a deadly weapon a year or more before the [rape]."[42] Psychologists had deemed him "not disposed toward violent or dangerous behavior,"[43] and the court found no evidence that his father had "had any indication that John Jr. was disposed to commit the crime committed."[44] Dinsmore argues that this makes the rest of the opinion *dicta*, but we find that the following was an alternate basis to affirm. John Jr.'s parents sought help from psychologists and counselors, "made frequent attempts to discipline John, Jr. and to reason with him," and put him in a private school, all to no avail.[45] The court noted, in a frank discussion apposite to this case, that there was little more the parents could have done to control their near-adult son short of constantly guarding him:

> John, Jr. was 17 years old at the time of the rape.... The opportunity to control a young man of this age obviously is not as great as with a younger child. The crime involved occurred during the very early morning hours after parents would ordinarily be expected to be in bed. Short of standing guard over the child twenty-four hours a day, there was little that the defendant father could do to prevent John, Jr. from leaving the home after [he] was asleep....
>
> ... [His] parents ... sought professional help for John, Jr. early and often. We fail to see that much more could have been done by them, short of physically restraining his movements and placing him under twenty-four hour a day observation.[46]

This description recalls Superior Court Judge Larry Card's poignant comments at Hall's juvenile-waiver hearing that Mrs. Alvord "has been diligently getting him into every program she could," and "has tried so hard to help him turn around."

*Barth* and *Moore* provide a meager basis for analogizing to other states' resolution of similar cases, but the absence of *any* reported cases holding parents liable on even vaguely similar facts bodes ill for Dinsmore.

2. *Dinsmore has not shown a genuine dispute as to whether the Alvords had a specific reason to know of a need or opportunity to control Hall.*

█ The Alvords were undisputedly on general notice of Hall's dangerous propensity. To analyze thoroughly whether they acted reasonably seems to us to entail four questions: (a) Did they respond appropriately to specific prior violent acts? (b) Have their subsequent general efforts to control Hall been reasonable? (c) Should they have foreseen the need to prevent this specific incident? and (d) If so, did they make reasonable efforts to do so? We do not mean to suggest that the Alvords must successfully answer all four questions in order to avoid liability, but only that each question is relevant, in that an unfavorable answer could at least contribute to a finding of negligence.

---

38. *See Moore v. Crumpton*, 306 N.C. 618, 295 S.E.2d 436, 440 (1982). We do not find persuasive Dinsmore's argument that the court applied a significantly different analysis from that of § 316.

39. *See id.* at 442.

40. *See id.* at 438.

41. *Id.* at 438.

42. *Id.* at 442.

43. *Id.* at 439.

44. *Id.* at 442.

45. *Id.* at 439; *see also id.* at 442.

46. *Id.* at 442.

On the first query, the Alvords offered evidence that they responded properly at the time to past incidents—they put Hall in many in- and out-patient treatment programs. Dinsmore has not challenged that evidence.

The second query is general: After responding immediately to past misconduct, did the parents maintain reasonable measures to keep tabs on and control the child to prevent recurrences? The treatment programs in which the Alvords put Hall, and their cooperation with his probation, could suffice. Dinsmore suggests, however, that they had a duty to enforce a curfew—since the 1991 shooting occurred when Hall was running around town late at night with his friends—and to systematically search Hall's room and belongings for weapons. This is Dinsmore's most plausible argument. Precedent offers no guidance on whether it alone suffices to raise a jury question. We return to it after considering the third and fourth questions.

■ Those questions are whether the parents should, in the exercise of due care, have recognized any specific signs that their child was imminently likely to do something violent and, if so, whether they took reasonable steps to prevent harm. Dinsmore is surely correct that a parent need not be immediately present to be liable for negligently failing to prevent a child's intentional tort. But *Barth, Moore,* and *Cooper* all suggest, and we now hold, that a plaintiff must show more than a parent's general notice of a child's dangerous propensity. A plaintiff must show that the parent had reason to know with some specificity of a present opportunity and need to restrain the child to prevent some imminently foreseeable harm. General knowledge of past misconduct is, in other words, necessary but not sufficient for liability.

■ Dinsmore offered no evidence creating a triable issue on the latter two questions. As the Alvords note, Dinsmore's one piece of admissible evidence established Hall's likely involvement in the Halloween assaults, five months before Dinsmore's murder. The Alvords replied with uncontroverted affidavits that they had no knowledge of the assaults until after the shooting. The Halloween incident cannot contribute to showing that they should have foreseen a specific, present opportunity and need to control Hall. The evidence of Hall's successful September 1991–November 1992 probation suggested that the Alvords had no reason, in April 1993, to know that he posed an imminent threat to commit a violent crime requiring them to closely supervise him or, as Dinsmore suggests, return him to State custody under the statutory provisions for runaways and children who are habitually absent from home or reject parental care.[47]

The evidence thus raises no jury question as to whether the Alvords should have known, at the time of the incident, of an opportunity or need to control Hall. That leaves the failure-to-take-general-measures argument. That argument implicates Dinsmore's claim that it was improper to grant the Alvords summary judgment on a disputed question of tort duty.

3. *The judgment did not violate our rule disfavoring summary adjudication of the scope or fulfillment of a tort duty.*

Dinsmore stresses the body of commentary and opinions disfavoring summary judgment in negligence cases.[48] But she identifies no genuine factual dispute, claiming only that a jury could draw different inferences from the evidence and find the Alvords negligent for not better controlling Hall. Nor does she specify any particular inference that the court wrongly drew. She challenges only the court's ultimate conclusions that the Alvords showed a lack of evidence that they owed Dinsmore a duty at the time of the murder, and that Dinsmore identified no specific facts from which a jury reasonably could find a duty and breach thereof.

Dinsmore notes our consistent rule that a party seeking summary judgment has the

---

**47.** *See* AS 47.10.010(a)(1), 47.10.141.

**48.** *See, e.g., Maddox v. River & Sea Marine, Inc.,* 925 P.2d 1033, 1035–36 (Alaska 1996); 10A Charles A. Wright et al., *Federal Practice and Procedure* § 2729, at 533–36, 551–72 (1998).

"entire burden" of proving that there are no factual disputes and that it is entitled to judgment as a matter of law.[49] Dinsmore also stresses that, as the nonmovant, she did not *have* to produce any evidence.[50] But the fact that she did not have to offer evidence until the Alvords had " '[made] out a prima facie case that would entitle [them] to a directed verdict if uncontroverted at trial' "[51] does not mean that the court erred in finding that the Alvords had done so, that the burden had shifted to Dinsmore to show specific facts raising a genuine issue for trial, and that she failed to do so.

We recently discussed the propriety of summarily judging the existence or scope of a tort duty in *Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell,* 956 P.2d 1199 (Alaska 1998). We held that summary judgment is proper if the only reasonable inference from undisputed facts is that a defendant simply owed a plaintiff no duty.[52] Summary judgment is often improper if a defendant undisputedly owed a plaintiff some duty, and the question is whether the duty's precise scope encompassed a given situation, or whether given acts or omissions satisfied the duty, i.e., whether they constituted negligence, or due care.[53]

*Arctic Tug* involved a duty that is specific to individual plaintiffs—the duty to disclose information.[54] We affirmed summary judgment because the defendant and plaintiff had not had any meaningful contact from which any such duty could have arisen.[55] Under § 316, though, parents arguably owe some duty to the world at large; i.e., a duty to whoever may encounter their child to make reasonable efforts to control the child.

The Alvords, however, showed that nothing should have led them to foresee, *in mid-April 1993,* a specific need and opportunity to keep Hall from hurting someone. We might thus say that they owed Dinsmore no duty. Or we might say that they owed Dinsmore, along with the rest of the world, a general duty to be prepared to control Hall. Nothing, however, had happened to convert that duty into a duty to act; i.e., to put the Alvords on notice that they must take steps to prevent Hall from imminently, foreseeably harming someone. On either view, summary judgment was proper.

Dinsmore's only plausible reply is that the Alvords *should* have known that Hall had a gun, because they should have regularly searched his effects, and *should* have prevented the murder, even if there were no specific signs of trouble, because they should have imposed a curfew on Hall. But Dinsmore's view of § 316 would ensure that parents who know of a child's violent propensity would almost always have to face a jury whenever the child hurt someone. Even if a plaintiff could show no reason that the parents should have known of a specific need to control the child, the plaintiff could almost always posit some stricter regime of discipline and surveillance under which the parents might have *discovered* that need. We assume for the sake of discussion that parents' inadequate general efforts to monitor a violent child, in the period between the child's initial misconduct and the time immediately before the violence at issue, can support a plaintiff's case. But the plaintiff must first make some showing that the parents should have known at the time of a specific need and occasion to control their child. To send to a jury the general-measures argument alone would carry the rule of § 316 too far towards making parents, once aware of their child's dangerous propensity, into insur-

49. See *Nizinski v. Golden Valley Elec. Ass'n,* 509 P.2d 280, 283 (Alaska 1973) (*quoted in Shade v. Co & Anglo Alaska Serv. Corp.,* 901 P.2d 434, 437 (Alaska 1995) and *Williams v. Municipality of Anchorage,* 633 P.2d 248, 250 (Alaska 1981)).

50. *See, e.g., Webb v. City & Borough of Sitka,* 561 P.2d 731, 735 n. 18 (Alaska 1977).

51. *Shade,* 901 P.2d at 437 (quoting 10A Charles A. Wright et al., *Federal Practice & Procedure* § 2727, at 143–46 (1983)).

52. *See Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell,* 956 P.2d 1199, 1203–04 (Alaska 1998).

53. *See id.* at 1203.

54. *See id.* at 1202 (citing Restatement (Second) of Torts § 551 (1977)).

55. *See id.* at 1202–03.

ers and prison wardens until the child's eighteenth birthday.

### D. Whether the Superior Court Abused Its Discretion in Making the Summary Judgment Final under Civil Rule 54(b) Is Moot.

The Alvords moved the court under Rule 54(b) to make the summary judgment in their favor final, even though other defendants remained in the case. Dinsmore opposed the motion and now appeals its grant.

Rule 54(b) allows a court to "direct the entry of a final judgment as to ... fewer than all of the ... parties only upon an express determination that there is no just reason for delay." It is an exception to the rule allowing appeals "only after the entire case is disposed of on all substantive issues." [56] We have stressed that "the policy against piecemeal litigation is very strong, and 'there must be a good reason for using [Rule] 54(b).'" [57] The usual reason is hardship: "Typically, use of Rule 54(b) is appropriate only if the party seeking judgment is likely to suffer actual hardship otherwise." [58] But the word "typically" shows that we have not made hardship a categorical requirement. This accords with the federal view that, since it is impossible to catalog all reasons to grant a Rule 54(b) motion, courts have discretion to consider any relevant factor.[59]

The issue is moot. The reason Dinsmore opposed entry of a final judgment was to avoid having to spend time and money on an immediate appeal. Dinsmore has now spent that time and money, and we have reached and affirmed the merits. Even if Dinsmore's argument were persuasive, to remand would serve no legitimate purpose. Indeed, it could only result in an inefficient use of judicial resources and be an economic hardship to the parties. We conclude that the issue is moot and therefore decline to address it.

## IV.  CONCLUSION

The judgment of the superior court is AFFIRMED.

---

**56.** *Johnson v. State,* 577 P.2d 706, 709 (Alaska 1978).

**57.** *S & B Mining Co. v. Northern Commercial Co.,* 813 P.2d 264, 269 (Alaska 1991) (quoting *Johnson,* 577 P.2d at 710).

**58.** *Williams v. Mammoth of Alaska, Inc.,* 890 P.2d 581, 586 (Alaska 1995) (citing *Johnson,* 577 P.2d at 710).

**59.** *See* 10 Jeffrey W. Stempel, *Moore's Federal Practice* § 54.23[1][b], at 54–71 (3d ed.1997); 10 Wright et al., *supra* note 55, § 2659, at 111–12 (citing *Curtiss–Wright Corp. v. General Elec. Co.,* 446 U.S. 1, 10–11, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980)).