v.

**STATE of Alaska, DEPARTMENT OF HEALTH AND HUMAN SERVICES, DIVISION OF FAMILY AND YOUTH SERVICES, Appellee and Cross–Appellant.**

**Nos. S–8062, S–8142.**

Supreme Court of Alaska.

June 30, 2000.

---

John S. Hedland, and Amy L. Vaudreuil, Hedland, Brennan, Heideman & Cooke, Anchorage, for Appellants/Cross–Appellees.

William F. Morse, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee/Cross–Appellant.

Before MATTHEWS, Chief Justice, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

### I. INTRODUCTION

Penny and Richard Green [1] sued the Division of Family and Youth Services (DFYS) after their foster child, Billy, physically and sexually assaulted their two children. The Greens alleged that DFYS negligently failed to disclose information that would have alerted them to the risks of accepting Billy into their home. The superior court assumed that DFYS had a duty to give the Greens relevant information about Billy. But it granted summary judgment to DFYS, finding part of their claim barred by AS 09.50.250(3)—which immunizes the state from claims of misrepresentation—and the balance barred because Billy's actions were unforeseeable. We reverse, concluding that DFYS owed the Greens a duty of disclosure, that a reasonable jury could find Billy's actions a foreseeable result of breaching this duty, and that AS 09.50.250(3) only bars suits for financial or commercial misrepresentations.

### II. FACTS AND PROCEEDINGS [2]

In November 1991 Penny and Richard Green became the foster parents of Billy, a child in need of aid who was then thirteen years old. Although they had a daughter and son of their own, aged eight and ten, the Greens were first-time foster parents.

Before moving to Alaska in 1990, Billy and his brother lived in Washington state with their mother. Washington school officials described Billy as "a troubled boy with much anger." In September 1990, after Billy displayed behavioral problems in school, Billy's mother sent the two boys to live with their father in Soldotna.

Once Billy arrived in Alaska, his father alerted Billy's new school to potential problems and worked with the school to provide an appropriate placement. On September 20 Billy's father took Billy to see Dr. Kathleen Dinius, a Soldotna psychologist. Dr. Dinius reported that Billy's mother had described him as "exhibiting serious behavior problems." Dr. Dinius stated that she "anticipated ... that [Billy] would develop behavior problems, probably of a serious nature ... that would require professional help."

Edward Harrison, a school psychologist, also interviewed and tested Billy to determine an appropriate grade placement. In a report dated September 27, 1990, Harrison noted that Billy's teacher had described him as "street wise." Harrison found Billy to be "evasive and guarded in his responses." Testing showed signs that the boy was anxious over self-disclosure and depressed, and also suggested "themes of anger, feelings of abandonment and being without control in an untrustworthy adult world." Harrison warned that Billy's "defenses appear taxed to a point where withdrawal may be necessary for coping with adults.... The future may appear chaotic and out of control to [Billy] with little hope for adequacy in meeting normal social role expectations as a person, as student or as a son."

According to Harrison, Billy would "become easily upset when given constructive criticism. His outlook is pessimistic...." Harrison concluded that "[f]or educational purposes [Billy] should be considered severely emotionally disturbed and in need for special education intervention for him to benefit

1. We use pseudonyms for the appellants and members of their family, including their foster son, to protect their privacy.

2. Because we are reviewing an order granting summary judgment against the Greens, our discussion of the facts presents the evidence in the light most favorable to their claim. *See Howarth v. State, Public Defender Agency*, 925 P.2d 1330, 1332 (Alaska 1996).

from his educational program.... His difficulties have persisted over a long period of time and to a marked degree they have adversely affected his educational performance." One of the tests that Harrison gave Billy consisted of a display of ambiguous pictures. Billy's responses focused on murder, death, anger, suicide, guns, blood, sex and sexuality, disease, and strangulation.

Billy encountered difficulty at school throughout the ensuing year. In April 1991 a special services teacher wrote that Billy "has psychological needs that are not being met at this time," was not making satisfactory progress in school despite the school's attempts to meet his needs, and would benefit from outside counseling.

DFYS first became involved with Billy in April, after he and his older brother contacted the agency and asked to be placed in a foster home. The boys told a DFYS social worker that their father "has kicked [and] hit [Billy] in the past," "smokes pot all day" and "is moody [and] unpredictable when high," and offered marijuana to them. The boys went to the home of an aunt—their father's sister—who confirmed that Billy's father abused his children; she indicated that she did not want them to return to his home.

A few days later, DFYS caseworker Pam McDermott interviewed Billy's father, who denied any abuse. Billy's father told McDermott that Billy was "street wise" and had come to Alaska with a cigarette addiction. Billy's father also informed McDermott that a school psychologist had evaluated Billy and that Billy had seen Dr. Dinius. Afraid that Billy would be defiant and would not cooperate, his father initially told McDermott that he did not want Billy back. McDermott also interviewed Billy that day and found him "very uncooperative, defiant, negative, sneering." After concluding that Billy would be safe with his father and securing his father's agreement to take him back, McDermott allowed Billy to return home.

Billy subsequently became involved in two school-related fighting incidents with girls in which he pulled down the pants of—or "pantsed"—his opponents. On each occasion, Billy was suspended from school for his behavior. The second incident occurred on October 31, 1991. While being questioned in the school office about the pantsing, Billy told school officials that he did not want to return home because, according to the caseworker's report, "he won[']t live in that kind of place anymore." The school contacted DFYS, which took emergency custody and placed Billy in a temporary foster home. His temporary foster father, Tom Musgrove, evidently knew that Billy had psychological and behavioral problems and was aware that the school psychologist, Harrison, had evaluated Billy;[3] on November 8, 1991, Musgrove talked to McDermott about these issues, recommending that DFYS speak with Harrison about Billy's progress.

Several days later, DFYS gave custody of Billy to the Greens. Their involvement resulted from a telephone call by Penny's mother to a DFYS office to inquire about becoming a foster parent. DFYS caseworker Lela McNutt told Penny's mother about Billy's situation. According to Penny's mother, McNutt "played on my heartstrings," offering her custody of Billy and saying that he was being abused by his father, had recently been placed in a temporary foster home, and urgently needed a more permanent placement. Penny's mother demurred, telling McNutt that her current living quarters were too small to accommodate a foster child and that she was planning to buy a larger home. But that night, at dinner, Penny's mother told Penny and Richard about her conversation with McNutt and described Billy's plight. The Greens decided that they might be able to take Billy.

Penny and her mother went to the DFYS office on November 11, 1991, for what Penny expected would be an initial consultation. But upon meeting with McNutt, they found that she was ready to arrange the foster placement immediately, telling Penny and her mother that Billy "was a really good kid, had never been in trouble before, had never been in a foster home before, had no problems, that he—that he was just a kid that needed a place to stay...." Relying on McNutt's statements, the Greens agreed to

---

3. The record does not establish how Musgrove obtained this information.

take foster custody of Billy; he arrived at their home the same day.

DFYS gave the Greens few special instructions about foster parenting and no specific information about Billy. As Penny's mother testified in her deposition:

[T]here was no orientation at all. We just went over there, met with her, she came over and looked at the home, we went over and got [Billy]. That was it .... [my daughter and son-in-law] just, I guess, assumed you take care of a foster child just like you take care of any child; you feed them, clothe them, love them, care for them, just like you do any child.

Billy lived with the Greens and their two children until February 1992. Neighbors reported Billy to the Department of Fish and Game for shooting at a moose with a BB gun. Billy also became involved in a new "pantsing" incident, pulling down the pants of another child, "underwear [and] all[,] in front of many people." When confronted by the Greens, Billy's anger escalated, and his attitude deteriorated; the Greens felt that they could not control him, and ultimately relinquished custody to DFYS.

After Billy left the Greens, their children disclosed that Billy had repeatedly assaulted them, sexually and physically abusing the daughter and physically abusing the son. The children said that Billy had also threatened to rape the daughter and kill the children's parents and pets if the children told anyone about his misconduct. The Greens reported Billy's assaults to the police. After investigating the reports, the state filed delinquency charges against Billy, who ultimately admitted engaging in conduct amounting to fourth-degree assault and was adjudicated a delinquent.

The Greens sued the state in January 1993, alleging that DFYS knew or should have known that Billy posed a serious threat of harm and that the agency negligently injured them and their children by breaching its duties to protect the Greens and provide them with information before it placed Billy in their home.

DFYS moved for summary judgment, characterizing Count III of the Greens' complaint—their claim for failure to disclose information—as a claim of misrepresentation and arguing that, as such, it was barred by AS 09.50.250(3)—a provision immunizing the state from claims arising out of misrepresentation. The superior court partially granted the state's motion, dismissing Count III because it included allegations of misrepresentation.

After the parties took numerous depositions, the Greens moved for summary judgment on their remaining claims. DFYS eventually filed a cross-motion for summary judgment. The superior court granted summary judgment to the state and dismissed the case, finding insufficient evidence in the record to establish that Billy's actions were foreseeable.

The Greens appeal the superior court's summary judgment orders.

## III. DISCUSSION

### A. Standard of Review

█ In reviewing a grant of summary judgment, we consider whether there were any genuine issues of material fact and whether the moving party was entitled to judgment as a matter of law.[4] We view the facts in the light most favorable to the non-moving party.[5]

### B. Did the Superior Court Err in Finding No Genuine Issues of Material Fact?

#### 1. DFYS's duty of care to the Greens

In summarily rejecting the Greens' claim that DFYS failed to exercise the care necessary to prevent Billy from harming them, the superior court assumed "that the State owed a duty of reasonable care to the [Greens]." But it found that despite this duty, summary judgment was warranted because "there are no issues of material fact and reasonable people could not disagree that the actions of [Billy] complained of were not foreseeable."

---

4. See Drake v. Hosley, 713 P.2d 1203, 1205 (Alaska 1986).

5. See Howarth v. State, Public Defender Agency, 925 P.2d 1330, 1332 (Alaska 1996).

■ The state concedes it owes a duty of due care to protect prospective foster parents from harm by foster children and that the duty takes form in a requirement of reasonable disclosure: "The State agrees that it must provide prospective foster parents with reasonable information about a child prior to placement and must take reasonable steps to gather such information." We too agree that the state owes a duty of reasonable care to protect prospective foster parents.

■ As we recently emphasized, "[t]he existence of a duty turns not ·on the particularized facts of a given case, but rather on the basic nature of the relationship between the parties to the cause of action." [6] In *D.S.W. v. Fairbanks North Star Borough School District*, we laid out the factors that courts must consider in determining whether a duty

of care exists.[7] Applying the *D.S.W.* factors in *Division of Corrections .v. Neakok*, we determined that the special relationship between the Alaska Department of Corrections and parolees under its supervision gave rise to an actionable duty to warn or otherwise protect their potential victims.[8] We similarly concluded in *R.E. v. State* that the state owed parents whose children used DFYS-licensed daycare facilities a duty to take reasonable steps to prevent harm to their children from sexual abuse.[9]

*D.S.W., Neakok,* and *R.E.* compel us to find the existence of a duty in the present case.[10] Here, as in *Neakok* and *R.E.*, DFYS stands in a special relationship both with children in need of aid who come under its supervision and with prospective foster parents whom it seeks to enlist as their custodians. Because placing a foster child poses foreseeable risks to new foster parents,[11] this

6. *M.A. v. United States*, 951 P.2d 851, 854 & n. 6 (Alaska 1998) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 53, at 356 (5th ed. 1984) ("It is better to reserve 'duty' for the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other, and to deal with particular conduct in terms of a legal standard of what is required to meet the obligation.")). *See also Division of Corrections v. Neakok*, 721 P.2d 1121, 1125 (Alaska 1986) (quoting Prosser, *Law of Torts* (4th ed.1971) at 325–26 (" 'Duty,' as the word is used in negligence law, 'is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection.' ")).

7. 628 P.2d 554, 555–56 (Alaska 1981) (quoting *Peter W. v. San Francisco Unified Sch. Dist.*, 60 Cal.App.3d 814, 131 Cal.Rptr. 854, 859–60 (1976)). Specifically, we listed the following factors:

[1] The foreseeability of harm to the plaintiff, [2] the degree of certainty that the plaintiff suffered injury, [3] the closeness of the connection between the defendant's conduct and the injury suffered, [4] the moral blame attached to the defendant's conduct, [5] the policy of preventing future harm, [6] the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and [7] the availability, cost and prevalence of insurance for the risk involved.
*Id.*

8. *See Neakok*, 721 P.2d at 1126 (citing *Tarasoff v. Regents of Univ. of Cal.*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 342–43 (Cal.1976) and Restatement (Second) of Torts § 315 (1965))

("[T]he common law has not required a defendant to prevent foreseeable harm when, to do so, he or she must control the conduct of another person or warn of such conduct. This rule has an important exception: When a defendant stands in a special relationship to either the dangerous person or the potential victim, the defendant is required to control the dangerous person or warn or otherwise protect the victim.").

9. 878 P.2d 1341, 1345 (Alaska 1994).

10. We note that the Nebraska Supreme Court has found the same duty to exist in similar circumstances. *See Haselhorst v. State*, 240 Neb. 891, 485 N.W.2d 180 (1992); *see also Talle v. Nebraska Dep't of Soc. Servs.*, 249 Neb. 20, 541 N.W.2d 30 (1995); *Moore v. State*, 245 Neb. 735, 515 N.W.2d 423 (1994).

11. In the context of determining the existence of a duty, we have made it clear that foreseeability is a broad concept and does not require that the precise harm in a given case be predictable. *See, e.g., Neakok*, 721 P.2d at 1127 n. 7 ("In deciding whether Nukapigak's criminal acts were a 'foreseeable' risk of a failure to use due care, we do not determine whether, under the specific facts of this case, state employees should have foreseen that the murders would occur."); *R.E.*, 878 P.2d at 1346–47 (stating, as a basis for rejecting argument that DFYS could not have foreseen sexual abuse that occurred at the daycare clinic it licensed, that "[s]exual abuse was a prevalent social concern in the early 1980's. . . . The fact that the State sought to regulate this area suggests that it recognized the vulnerability of young children left with strangers. The most important *D.S.W.* factor is met.").

special relationship requires DFYS to exercise due care to minimize potential harm by making reasonable efforts to gather and disclose facts necessary to give foster parents an informed basis for deciding whether to accept a particular child and what supervision the child may need.

We emphasize that this duty to investigate and disclose only requires DFYS to take steps that a reasonable person in its position would find prudent under the totality of the circumstances. Determining whether this duty has been breached will require a careful, case-specific balancing of factors such as the recency, reliability, and accessibility of any undisclosed information, the nature and degree of risk stemming from nondisclosure, the child's legitimate interests in privacy, the state's compelling interest in ensuring prompt and appropriate placement for children needing aid, the limited resources of an agency like DFYS, the agency's compliance with its own internal policies, and the existence of any unusual exigencies.[12] While the precise scope of this duty is a question of fact for the jury,[13] its general contours here are clearly defined by DFYS standards governing disclosure. DFYS's Child Protective Services Manual provides:

> To assist the foster family in making an informed decision regarding whether to accept a particular child, to help the foster family anticipate problems which may occur during the child's placement, and to help the foster family meet the needs of the child in a constructive manner, [the agency shall] provide the following information to the foster family:
>
> 1. the strengths, needs, and general behavior of the child;
>
> 2. circumstances which necessitated placement of the child;
>
> 3. information about the child's family and his relationship to his family;
>
> 4. [i]mportant life experiences and relationships which may affect the child's feelings, behavior, attitudes, or adjustment;
>
> 5. [m]edical history, to include third party coverage which may be available to the child;
>
> 6. education history, to include present grade placement, special strengths, weaknesses.[14]

Under these standards, the information at issue in the present case—school performance and disciplinary records, relevant information from recent psychological evaluations, and past family and placement history—falls squarely within the range of disclosable information.[15]

### 2. *Foreseeability of alleged harm caused by Billy.*

The superior court's primary basis for granting summary judgment was that Billy's actions were not foreseeable:

> Referring to certain language in DFYS guidelines, Plaintiffs suggest that ... "but for" the failure of DFYS to communicate such information, the injuries would not have occurred. The simplicity of such a theory has certain visceral appeal. But it is not one upon which the liability of DFYS can be predicated. Based upon all information available to DFYS at the time of placement, it was not foreseeable that [Billy] would engage in assaultive behavior towards the foster children.

(Footnote omitted.)

We often use the concept of foreseeability to determine the existence of a duty:

**12.** *See generally* Restatement (Second) of Torts §§ 291–293 (1965).

**13.** *See, e.g., Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell,* 956 P.2d 1199, 1203 (Alaska 1998) ("Summary judgment is proper where the only reasonable inference from the undisputed facts is that one party owed another no duty whatsoever—or owed a duty clearly and vastly narrower in scope than the one that the other party asserts in opposing summary judgment."); *see also Neakok,* 721 P.2d at 1127 n. 7 ("While a specific case-by-case determination of foresee-

ability and causation lies within the province of a jury, the existence of a duty is a question of law.").

**14.** *DFYS Child Protective Services Manual* Ch. 3.0, § 3.9(c) (1991).

**15.** The state separately argues that the Greens waived their right to rely on the deposition testimony of school psychologist Harrison. We find no merit to this argument.

if no harm is foreseeable from the defendant's conduct, then no duty is owed.[16] Yet here the superior court explicitly assumed that DFYS did owe a duty to the Greens, so its finding of unforeseeability necessarily addressed issues of causation and negligence rather than duty.

We have upheld summary judgment on questions of tort duty when "the undisputed facts support only one reasonable inference."[17] But "in cases where no one disputes the existence of a duty running from one party to another, we have disfavored summary adjudication of the precise scope of that duty, or of whether particular conduct did or did not breach it (i.e., constitute negligence)."[18] Yet, in this case, the state urges us to uphold the superior court's ruling because none of the allegedly undisclosed information here pointed specifically to the possibility that Billy might assault the Greens' children:

It does not matter whether the predictive quality of the unfurnished information is analyzed in terms of whether there was a duty to reveal that information, whether the State breached any informative duty, or whether ignorance of the information was a proximate cause of the harm to the [Green] children. Regardless of the legal category to which foreseeability is assigned, the outcome is the same. Even assuming that the State should have known of and disclosed the information, disclosure would not have made [Billy's] assaultive behavior foreseeable.

In pressing this argument, the state relies heavily on this court's recent decision in *Dinsmore–Poff v. Alvord*.[19] There, the parents of a young homicide victim sued the parents of his assailant—a seventeen-year-old boy with a history of juvenile crime—for

negligent supervision; in affirming summary judgment against the plaintiffs, we acknowledged that the assailant's parents were on notice of his general propensity for assaultive behavior, but we held that to prevail on a negligent supervision claim, ·

a plaintiff must show more than a parent's general notice of a child's dangerous propensity. A plaintiff must show that the parent had reason to know with some specificity of a present opportunity and need to restrain the child to prevent some imminently foreseeable harm. General knowledge of past misconduct is, in other words, necessary but not sufficient for liability.[20]

But *Dinsmore–Poff* and the other similar cases upon which the state relies [21] are readily distinguishable from the present case; the cause of action that they address is negligent supervision, a narrow theory of liability predicated on the supervisory duty over children that parents owe to the community at large.[22] As we emphasized in *Dinsmore–Poff*, the Restatement of Torts limits this cause of action to cases in which a parent "knows or has reason to know that [the parent] has the ability to control [the] child, and ... *knows or should know of the necessity and opportunity for exercising such control.*"[23] In requiring specific knowledge of "imminently foreseeable harm," our opinion in *Dinsmore–Poff* did not construe or narrow the traditional foreseeability standard; rather, it interpreted and applied the Restatement's "necessity and opportunity" requirement—a substantive element of a negligent supervision claim.[24]

By contrast, we deal here not with a negligent supervision claim or with a general supervisory duty that the state owes to the public, but rather with the more specific duty

16. See *Dinsmore–Poff v. Alvord*, 972 P.2d 978, 987 (Alaska 1999); *see also supra* note 11.

17. *Arctic Tug*, 956 P.2d at 1203 (citing *Smith v. State*, 921 P.2d 632, 634 (Alaska 1996)).

18. *Id.*

19. 972 P.2d at 978.

20. *Id.* at 986.

21. *See, e.g., Adolph E. v. Linda M.*, 170 A.D.2d 1011, 566 N.Y.S.2d 165 (N.Y.App.Div.1991);

*Moore v. Crumpton*, 306 N.C. 618, 295 S.E.2d 436 (1982); *Barrett v. Pacheco*, 62 Wash.App. 717, 815 P.2d 834 (1991).

22. *See Dinsmore–Poff*, 972 P.2d at 981.

23. *Id.* at 980–81 (quoting Restatement (Second) of Torts § 316 (1965) (emphasis added)).

24. *Id.* at 981–86.

of due care that DFYS owes prospective foster parents—a duty arising from the special relationship that the agency creates when it enlists adults to accept foster custody and places foster children in their homes. In this situation we apply the same conventional principles of foreseeability that we normally apply to questions of causation and negligence.

We have generally recognized that a defendant's negligent conduct may be the legal or proximate cause of the plaintiff's injury if the negligent act was more likely than not a substantial factor in bringing about the injury.[25] "The issue of proximate cause is normally a question of fact for the jury to decide and becomes a matter of law only where reasonable minds could not differ."[26]

Negligence and causation necessarily involve foreseeable risks.[27] But in this context foreseeability does not imply an ability to predict precise actions or injuries: "When the risk created causes damage in fact, insistence that the precise details of the intervening cause be foreseeable would subvert the purpose of that rule of law."[28] Thus, Prosser and Keeton note that there is "quite universal agreement that what is required to be foreseeable is only the 'general character' or 'general type' of the event or the harm, and not its 'precise' nature, details, or above all manner of occurrence."[29] Or as the Restatement puts it,

[t]he fact that the actor, at the time of his negligent conduct, neither realized nor should have realized that it might cause harm to another of the particular kind or in the particular manner in which the harm has in fact occurred, is not of itself sufficient to prevent him from being liable for the other's harm if his conduct was negligent toward the other and was a substantial factor in bringing about the harm.[30]

Prosser and Keeton observe that foreseeability is a question "of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results."[31] The Restatement presents the analytical approach for answering this policy question as follows: "The actor's conduct may be held not to be a legal cause of harm to another where after the event and *looking back* from the harm to the actor's negligent conduct, it appears to the court *highly extraordinary* that it should have brought about the harm."[32]

Our own cases follow the same approach.[33] Its expansive view of foreseeability seldom warrants summary dismissal of a negligence claim on the ground of unforeseeability:

Perhaps the Restatement has come close to expressing the underlying idea of a limitation of liability short of the remarkable,

25. See Morris v. Farley Enters., Inc., 661 P.2d 167, 169 (Alaska 1983).

26. Dura Corp. v. Harned, 703 P.2d 396, 406 (Alaska 1985).

27. W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 43, at 280–81 (5th ed.1984).

28. Yukon Equip., Inc. v. Fireman's Fund Ins. Co., 585 P.2d 1206, 1212 (Alaska 1978), quoted in Williford v. L.J. Carr Invs., Inc., 783 P.2d 235, 238 (Alaska 1989). See also Atwater v. Matanuska Elec. Ass'n, Inc., 727 P.2d 774, 778 n. 6 (Alaska 1986) (citing Restatement (Second) of Torts § 435 (1965)). This court has imposed a more stringent foreseeability requirement in matters of purely economic harm. See, e.g., Mesiar v. Heckman, 964 P.2d 445, 451 (Alaska 1998); Mattingly v. Sheldon Jackson College, 743 P.2d 356, 361 (Alaska 1987).

29. Keeton et al., supra note 27, § 43, at 299 (footnotes omitted).

30. Restatement (Second) of Torts § 435, cmt. a (1965).

31. Keeton et al., supra note 27, § 43, at 281.

32. Restatement (Second) of Torts § 435(2) (1965) (emphasis added). See also Keeton et al., supra note 27, § 43, at 281 ("Whether there is to be such legal responsibility is a matter of policy, of the end to be accomplished....").

33. See Fancyboy v. Alaska Village Elec. Co-op., Inc., 984 P.2d 1128, 1134 (Alaska 1999); Dura Corp. v. Harned, 703 P.2d 396, 402 (Alaska 1985). This standard of foreseeability applies to questions of negligence and causation:

The usual answer has been that "foreseeability" means, in "proximate cause," the same thing as in negligence; and that the same considerations which determine the original culpability are to be used again to determine liability for consequences.

Keeton et al., supra note 27, § 43, at 298.

the preposterous, the highly unlikely, in the sometime language of the street the cock-eyed and far-fetched, even when we look at the event, as we must, after it has occurred.[34]

In the present case, the superior court concluded as a matter of law that the information available to DFYS could not have allowed a reasonable person to predict Billy's subsequent assaults on the Greens' children. But the accuracy of this conclusion is beside the point for purposes of determining DFYS's potential liability. For as we have explained, foreseeability does not require an ability to predict precise actions and exact injuries.

Considering the evidence in the light most favorable to the Greens, it does not seem "highly extraordinary" that DFYS's conduct "should have brought about the harm" allegedly committed.[35] Reasonable jurors applying the correct standard of foreseeability could properly conclude that McNutt's alleged description of Billy as "a really good kid" who "had never been in trouble before" and "had no problems" was highly misleading, that DFYS failed to make reasonable efforts to gather and disclose relevant information concerning Billy's background, that this failure exposed the Greens to a foreseeable and unjustifiable risk that Billy might engage in harmful actions, that the injuries he allegedly inflicted were of the general nature that could be expected, and that the Greens could have avoided these injuries— either by declining to accept Billy as a foster child or by subjecting him to more rigorous supervision—had they known what they were entitled to know.

Accordingly, we conclude that the superior court erred in finding no genuine factual dispute on the issue of foreseeability and in granting summary judgment to the state on that basis.

**34.** Keeton et al., *supra* note 27, § 43, at 299.

**35.** Restatement (Second) of Torts § 435(2) (1965).

**36.** *See State v. Abbott,* 498 P.2d 712, 717 (Alaska 1972); 28 U.S.C. § 2680 (1999).

### C. Did the Superior Court Err in Granting Partial Summary Judgment to DFYS on Immunity Under AS 09.50.250(3)?

We must separately consider whether the Greens' claim for negligent failure to disclose was subject to dismissal under AS 09.50.250(3). Section .250 generally waives the state's sovereign immunity from suit, but subsection .250(3) provides that "an action may not be brought [against the state] under this section if the claim ... arises out of misrepresentation...." In interpreting this provision, we rely heavily on federal cases interpreting the Federal Tort Claims Act, which also contains a "misrepresentation" clause.[36]

The United States Supreme Court held in *United States v. Neustadt* that under this analogous provision of the federal act the federal government is immune from liability for misrepresentation arising from a negligent home appraisal by the Federal Housing Authority.[37] The Court noted, however, that its holding did not immunize the government from liability in general negligence cases:

> [M]any familiar forms of negligent conduct may be said to involve an element of "misrepresentation," in the generic sense of that word, but "[s]o far as misrepresentation has been treated as giving rise in and of itself to a distinct cause of action in tort, it has been identified with the common law action of deceit," and has been confined "very largely to the invasion of interests of a financial or commercial character, in the course of business dealings."[38]

Here, while the Greens do allege that DFYS misrepresented facts regarding Billy's personal history and character, their allegations do not arise from the invasion of any commercial or financial interests. They serve only to support the Greens' general theory that DFYS negligently failed to gather and disclose relevant information, and

**37.** 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961).

**38.** *Id.* at 711 n. 26, 81 S.Ct. 1294 (quoting Prosser, *Torts* § 85, "Remedies for Misrepresentation," at 702–03 (1941)).

thereby caused personal injury to their children. The Greens do not purport to advance a separate claim for the tort of misrepresentation.

In *Johnson v. State,* the California Supreme Court noted that

"misrepresentation" potentially lends itself to extremely expansive and elusive interpretations. A driver of an automobile who makes a misleading turn signal, for example, literally has "misrepresented" his intentions and subsequent course of conduct. Yet it would be senseless to hold the state liable if its employee failed to make any signal, arguably a "nonrepresentation," but reach the opposite result if he affirmatively "misrepresented" his intentions.[39]

Similarly, it would be senseless here to hold the state liable for failing to gather and disclose relevant information to potential foster parents, while providing immunity for affirmatively misrepresenting Billy's suitability for foster placement.

 We thus agree with the California Supreme Court's view that a " 'misrepresentation,' as a tort distinct from the general milieu of negligent and intentional wrongs, applies to interferences with financial and commercial interests." [40] We conclude that AS 09.50.250(3) only exempts the state from this type of misrepresentation claim. Because the Greens' claim against DFYS does not arise from an invasion of financial or commercial interests, AS 09.50.250(3) does not apply. We reverse the superior court's grant of summary judgment based on this provision.

## IV. *CONCLUSION*

DFYS owes a duty of due care to disclose relevant information to prospective foster parents. The evidence here, taken in the light most favorable to the Greens, would permit a reasonable jury to find that DFYS breached this duty and that its breach caused the Greens to suffer foreseeable injuries. The Greens' claim for negligent nondisclo-

sure does not allege financial or commercial misrepresentations and so is not subject to dismissal under AS 09.50.250(3). Accordingly, we REVERSE the superior court's summary judgment orders and REMAND for further proceedings.[41]

EASTAUGH, Justice, not participating.

---

**39.** 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352, 364 (1968).

**40.** *Id.* 73 Cal.Rptr. 240, 447 P.2d at 365.

**41.** Our reversal makes it unnecessary to consider the Greens' challenge to the superior court's order awarding the state prevailing party attorney's fees. The award must be vacated because the state is no longer the prevailing party.