STATE of Alaska, Department of Health and Social Services, Division of Family and Youth Services, Petitioners,

v.

Sandra SANDSNESS and Marci Burnett, individually and as Personal Representative of the Estate of Richard P. Sandsness, and as parent and legal guardian and next friend of Ryan Burnett, Respondents.

No. S–9910.

Supreme Court of Alaska.

May 23, 2003.

Robert P. Blasco, Robertson, Monagle & Eastaugh, Juneau, for Petitioner State of Alaska.

Ronald K. Melvin, Law Office of Ronald K. Melvin, Anchorage, for Respondents. [No brief filed.].

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Darrel Whitaker shot and killed Richard Sandsness seven weeks after the State of Alaska released Whitaker, a seventeen-year-old juvenile offender, from custody. Sandsness's widow and daughter sued the state for negligence, alleging that it knew Whitaker had dangerous propensities. Denying summary judgment to the state, the superior court held that the state, in deciding whether to ask a court to extend Whitaker's state commitment, owed an actionable duty to exercise due care. We reverse. Imposing this duty would conflict with the state's goal of rehabilitating juvenile offenders and could reduce public safety in the long run.

## II. FACTS AND PROCEEDINGS

Darrel Whitaker was placed on probation in early 1991 for vandalizing a vehicle and consuming alcohol. He was then fourteen years old. In August 1991, after he violated his probation conditions by possessing fire-starting devices and starting fires in a foster home, Whitaker was committed to the custody of the State of Alaska until August 9, 1993. The Alaska Division of Family and Youth Services (DFYS) placed him at McLaughlin Youth Center (MYC). In June 1993 his treatment supervisor recommended that Whitaker be released to his father's custody to work with his father in a remote logging camp. The recommendation stated that "[t]he prognosis for successful release and reintegration into society for Darrel is good." It noted the need to reunite him with his father and his "significant gains" during his stay at the youth center, and also stated that the "treatment team feels that the likelihood of any further progress while at MYC by Darrel would be minimal.... Reuniting Darrel with his father, providing an opportunity to continue his school, and the chance for employment would be the next logical

treatment move for him." Two other DFYS workers approved this recommendation, which was then referred to a review board, which also approved it. Per the recommendation, DFYS released Whitaker to his father's custody on July 2, 1993, several weeks before his commitment period would have expired on August 9.

On August 21 Whitaker shot and killed Richard Sandsness, an Anchorage taxi cab driver, while attempting to rob him. Whitaker turned seventeen a month after his release and about three weeks before he murdered Sandsness.

The decedent's widow and daughter sued the state and others. They alleged in part that DFYS negligently failed to properly evaluate Whitaker before his release, negligently failed to adequately supervise or control him after his release, and negligently failed "to communicate to the proper decision makers" his allegedly "violent propensities." The state moved for summary judgment on various theories.

The superior court granted in part and denied in part the state's summary judgment motions. Relying on this court's decision in *Division of Corrections v. Neakok*,[1] the superior court held that the state owed no duty to supervise or control Whitaker at the time of the murder because the crime occurred after Whitaker's period of commitment had expired. The superior court also held that the state owed no duty to warn the general public of Whitaker's dangerous propensity. The court initially declined to decide whether the state has a pre-release duty to petition a court to extend custody of a minor under AS 47.12.120(b)(1) if the state "is aware that the minor poses a danger to the general public." After the state moved for summary judgment on that issue, the superior court held that DFYS had a duty to act carefully and reasonably in deciding whether to ask the superior court to extend Whitaker's period of commitment. The court also held that DFYS's decision not to seek continued commitment of Whitaker was not immune from liability under the discretionary function im-

---

1. 721 P.2d 1121 (Alaska 1986).

munity doctrine codified at AS 09.50.250(1).[2] Accordingly, the court held that issues of material fact regarding whether the state breached this pre-release duty precluded summary judgment for the state.

The state petitioned for interlocutory review of the superior court's order denying the state's motion for summary judgment. We granted review under Appellate Rule 402(b)(2) and ordered full briefing.[3]

## III. STANDARD OF REVIEW

We review denials of summary judgment motions de novo to determine whether there are genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law, viewing all facts in the light most favorable to the non-movant.[4] The existence and extent of a duty of care are questions of law which we review de novo.[5]

## IV. DISCUSSION

The state asks us to hold that the superior court erroneously determined that DFYS had an actionable duty to use due care in deciding whether to ask a court to extend Whitaker's commitment to the state. Analyzing this case under the RESTATEMENT (SECOND) OF TORTS §§ 315 and 319 (1965), we conclude that the state did not owe the duty described by the superior court. We would reach the same conclusion if we were to employ the superior court's approach and apply the policy considerations adopted in *D.S.W. v. Fairbanks North Star Borough*

*School District*[6] and other policy considerations applicable to public agencies. Accordingly, we need not reach the other issues presented by the state's petition.[7]

### A. DFYS's Relationship with Juveniles Committed to Its Custody Does Not Give Rise to the Actionable Duty Imposed by the Superior Court.

The superior court held that DFYS's relationship with potentially dangerous juveniles committed to its custody justifies imposing an actionable duty on DFYS to exercise due care in determining whether to petition a court for continued commitment before release. The court noted that while there is generally no duty to prevent foreseeable harms committed by third parties, section 315 of the RESTATEMENT (SECOND) OF TORTS provides for an exception to this rule if the defendant has a special relationship with either the third party or the potential victim which justifies imposing such a duty.[8]

Section 315 states the rule as follows:

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

Section 319 describes the special relationship rule that potentially applies in this case:

---

**2.** The court held that the specific decision-makers—as opposed to the state—were nonetheless immune from suit under the doctrine of official immunity.

**3.** Appellate Rule 402(b)(2) authorizes discretionary review before final judgment where "[t]he order or decision involves an important question of law ... and an immediate review ... may advance an important public interest which might be compromised if the petition is not granted."

Counsel who originally appeared for respondents responded to the state's petition for review but filed no brief after we granted the petition and ordered briefing. New counsel appeared for respondents after briefing and argument were complete.

**4.** *P.G. v. State, Dep't of Health & Human Servs.*, 4 P.3d 326, 330 (Alaska 2000).

**5.** *Beck v. State, Dep't of Transp. & Pub. Facilities*, 837 P.2d 105, 109 (Alaska 1992).

**6.** 628 P.2d 554, 555 (Alaska 1981).

**7.** The petition presents two additional questions: (1) is deciding whether to ask a court to extend the commitment period a "discretionary function" entitled to immunity under AS 09.50.250(1); and (2) could a jury properly find that the state's failure to ask a court to extend that commitment caused Sandsness's injury.

**8.** *Cf. Neakok*, 721 P.2d at 1126 (citing RESTATEMENT (SECOND) OF TORTS § 315 (1965)).

One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

In holding that the state owed Sandsness an actionable duty, the superior court applied the so-called *D.S.W.* factors [9] and treated *Division of Corrections v. Neakok* as controlling.[10] This court held in *Neakok* that the state had a special relationship with a parolee, justifying imposition of a tort duty to control the parolee both because the state had a substantial ability to control him and because it had the "ability to foresee the dangers the parolee poses" to society upon release.[11] The superior court determined that this rationale is equally applicable here, because the state had ample opportunity to observe Whitaker and substantial ability to postpone his release.

The state contends that *Neakok* and other cases finding special relationships are inapposite because DFYS did not have any ability to control Whitaker at the time of the murder. The state argues that its special relationship with Whitaker ended with the original two-year commitment, which expired twelve days before the murder. Without a contemporaneous special relationship, the state argues, there is no basis for imposing a duty to control. We need not decide whether these propositions have merit because our agreement with another argument advanced by the state resolves this petition.

■ The state's argument that is dispositive relies on and quotes from *Sorge v. State*

in contending that imposing a duty to control on the basis of DFYS's relationship with Whitaker would "disturb the delicate balance the Legislature has crafted between the best interests of children and the broader interests of public safety." [12] In *Sorge*, the Vermont Supreme Court rejected the plaintiffs' contention that the state had an actionable duty under RESTATEMENT § 319 to control a juvenile who assaulted a newspaper delivery man during a weekend leave with his mother.[13] While agreeing that the state had a "special relationship" with juveniles committed to its custody, the Vermont Supreme Court rejected the contention that the state's exclusive purpose was to "control" those juveniles for the protection of the public.[14] Accordingly, the court refused to impose liability on the state for harm caused by third persons released from a state rehabilitative program.[15] The court surveyed relevant case law and noted that similar attempts to impose liability had been rejected by courts "that have recognized that most juvenile and adult programs dealing with persons committed to the custody of the State are intended to rehabilitate conduct rather than control it." [16] The court reasoned that tort liability for negligent release decisions could pressure states to " 'err more often on the side .of excessive detention.' " [17] This would "erode the public policy of rehabilitation of juveniles through reunification with their families and the public." [18]

The Vermont Supreme Court's reasoning applies with equal force in Alaska. We have recognized that "rehabilitation rather than punishment is the express purpose of juve-

---

**9.** *D.S.W. v. Fairbanks North Star Borough Sch. Dist.*, 628 P.2d 554, 555 (Alaska 1981).

**10.** 721 P.2d 1121 (Alaska 1986).

**11.** *Id.* at 1126. This court accordingly held that "[g]iven this special relationship, it is not unreasonable to impose a duty of care on the state to protect the victims of parolees." *Id.* at 1126–27.

**12.** *Sorge v. State*, 171 Vt. 171, 762 A.2d 816, 823 (2000).

**13.** *Id.* at 817–18, 820–23.

**14.** *Id.* at 820–23.

**15.** *Id.* at 820 (citing *Rivers v. State*, 133 Vt. 11, 328 A.2d 398, 400 (1974) (refusing to impose liability on state "where there is release on probation or parole, or even for early release based on good time")).

**16.** *Id.* at 820–21.

**17.** *Id.* at 821 (quoting *Ruf v. Honolulu Police Dep't*, 89 Hawai'i 315, 972 P.2d 1081, 1093 (1999)).

**18.** *Id.* at 822 (citing Vermont's statutory scheme for juvenile corrections and noting express purposes of rehabilitation and reintegration with society).

nile jurisdiction."[19] Successful rehabilitation demands the earliest possible reintegration of the juvenile with his family and community consistent with public safety.[20] The Alaska legislature has already crafted a balance between the interests of the child and the broader interest of public safety. Alaska Statute 47.12.120(b)(1) provides that the state may petition for and the court may grant extensions of commitment "if the extension is in *the best interests of the minor and the public*."[21] (Emphasis added.) Further, AS 47.12.260 permits DFYS to release juveniles at any time—without court approval—"if it appears to the satisfaction of the department that there is a *reasonable probability* that the minor will remain at liberty without violating the law."[22] (Emphasis added.) Thus, the legislature has allocated the risk of repeat offenses to the public in exchange, pre-

19. *Rust v. State*, 582 P.2d 134, 140 n. 21 (Alaska 1978); *see also* AS 47.12.010 ("The goal of this chapter is to promote a balanced juvenile justice system" which will protect the public and help juveniles develop into productive citizens).

20. *See* AS 47.05.060 ("The purpose of this title as it relates to children is to secure for each child the care and guidance, preferably in the child's own home, that will serve the ... welfare of the child and the best interests of the community ...."); *cf. Matter of S.D.*, 549 P.2d 1190, 1199 (Alaska 1976) ("[R]emoval of children from the family home may be a drastic, traumatic and emotionally damaging experience which is justified only under extreme conditions. Children should, if at all possible, be maintained in their homes with society providing the supportive services necessary to keep the family together.").

21. AS 47.12.120(b) provides in pertinent part:

If the minor is not subject to (j) of this section and the court finds that the minor is delinquent, it shall

(1) order the minor committed to the department for a period of time not to exceed two years or in any event extend past the day the minor becomes 19 years of age, except that the department may petition for and the court may grant in a hearing (A) two-year extensions of commitment that do not extend beyond the minor's 19th birthday if the extension is in the best interests of the minor and the public; and (B) an additional one-year period of supervision past age 19 if continued supervision is in the best interests of the person and the person consents to it; the department shall place the minor in the juvenile facility that the department considers appropriate and that may include a juvenile correctional school, juvenile work camp, treatment facility, detention home, or detention facility; the minor may be released from placement or detention and placed on probation on order of the court and may also be released by the department, in its discretion, under AS 47.12.260;

(2) order the minor placed on probation, to be supervised by the department, and released to the minor's parents, guardian, or a suitable person; if the court orders the minor placed on probation, it may specify the terms and conditions of probation; the probation may be for a period of time not to exceed two years

and in no event to extend past the day the minor becomes 19 years of age, except that the department may petition for and the court may grant in a hearing

(A) two-year extensions of supervision that do not extend beyond the minor's 19th birthday if the extension is in the best interests of the minor and the public; and

(B) an additional one-year period of supervision past age 19 if the continued supervision is in the best interests of the person and the person consents to it;

(3) order the minor committed to the custody of the department and placed on probation, to be supervised by the department and released to the minor's parents, guardian, other suitable person, or suitable nondetention setting such as with a relative or in a foster home or residential child care facility, whichever the department considers appropriate to implement the treatment plan of the predisposition report; if the court orders the minor placed on probation, it may specify the terms and conditions of probation; the department may transfer the minor, in the minor's best interests, from one of the probationary placement settings listed in this paragraph to another, and the minor, the minor's parents or guardian, the minor's foster parent, and the minor's attorney are entitled to reasonable notice of the transfer; the probation may be for a period of time not to exceed two years and in no event to extend past the day the minor becomes 19 years of age, except that the department may petition for and the court may grant in a hearing

(A) two-year extensions of commitment that do not extend beyond the minor's 19th birthday if the extension is in the best interests of the minor and the public; and

(B) an additional one-year period of supervision past age 19 if the continued supervision is in the best interests of the person and the person consents to it. ...

22. AS 47.12.260 provides:

A minor found to be a juvenile delinquent who by conduct gives sufficient evidence of having reformed may be released at any time under the conditions and regulations that the department considers proper, if it appears to the satisfaction of the department that there is

sumably, for offsetting gains realized by rehabilitating juvenile offenders to make them productive members of society.[23] Imposing tort liability for harm caused by released juveniles would distort this balance.

At least one state supreme court has implicitly rejected this analysis—at least with respect to adult parolees. In *Grimm v. Arizona Board of Pardons & Paroles*, the Arizona Supreme Court relied on RESTATEMENT § 319 to impose liability on a parole board for harms caused by a negligently released parolee.[24] The parole statute authorized release of prisoners only if there was a "reasonable probability that [the parolee] will live and remain at liberty without violating the law."[25] The court explained that, absent such reasonable probability, parole was not authorized and the board members could not receive immunity for granting parole.[26] The court held that:

> The board members should not bear liability for taking the risk allocated to them as a statutory duty. If it reasonably appears that the applicant is a good risk, the board members should not be liable if it turns out that they guessed wrongly.[27]

Under this view, tort liability for negligent release would simply reinforce rather than distort the legislative scheme—the parole board could only be held liable when reasonable jurors could find that the board subjected the public to a greater risk than that authorized by law.

The superior court in the case before us took a similar position. Noting that DFYS was already obligated under its own regulations to consider petitioning the court for continued commitment during its pre-release review,[28] the court implicitly reasoned that

imposing liability for a negligent failure to do so would not distort the proper balance between rehabilitation of juveniles and protection of the public. But the court also stated that "[i]n order to prevent future harm, the State must *ensure* that a potentially dangerous juvenile delinquent is not released." (Emphasis added.) This may be an understandable position in light of the ensuing tragedy in this case. But it illustrates the danger of using tort liability to police the state's discretion in the area of juvenile corrections—the state may well "err on the side of excessive detention" to avoid negligence suits or judgments.[29] This may seem to be good policy for citizens going about their private affairs, but it would unduly frustrate the primary goal of our juvenile justice system—rehabilitation.[30] In exchange for theoretical short-term benefits, the long-term benefits resulting from rehabilitation might be lost or diminished. The benefits of rehabilitation are not limited to those personal to the juvenile; they also include reducing the chances the juvenile will commit new crimes even as an adult. Accordingly, we hold that the state's special relationship with juvenile offenders in its custody does not justify imposing liability for negligently failing to petition the court to extend their commitment.

The superior court decision denying summary judgment to the state on the pre-release liability claim discussed *Neakok* in some detail and treated it as persuasive when the superior court conducted its *D.S.W.* analysis. In *Neakok* this court held that the state's supervisory relationship with its parolees justified imposing a duty to use care to prevent a parolee with known dangerous propensities from causing foreseeable injuries to

---

a reasonable probability that the minor will remain at liberty without violating the law.

**23.** One study in Pennsylvania cited in the state's brief found that fifty-five percent of all released juvenile offenders were subsequently rearrested. *See In the Interest of J.R.*, 436 Pa.Super. 416, 648 A.2d 28, 36–37 (1994).

**24.** 115 Ariz. 260, 564 P.2d 1227, 1234 (1977).

**25.** *Id.* at 1232 (quoting ARIZ.REV.STAT. § 31–412 (1977) (amended 1978)).

**26.** *Id.*

**27.** *Id.*

**28.** *See* 7 Alaska Administrative Code (AAC) 52.210 (2002) (providing that review board must consider several factors "[i]n determining whether a resident should be released, whether the resident's commitment should be allowed to elapse, or *whether a recommendation should be made for continued commitment*") (emphasis added).

**29.** *Sorge*, 762 A.2d at 821 (quoting *Ruf*, 972 P.2d at 1093).

**30.** *Rust*, 582 P.2d at 140 n. 21.

other people.[31] The facts of that case are distinguishable from the facts here. The releasee there was an adult whose release was mandatory. Although the state had no authority to extend his confinement or ask the court to do so, it had authority to impose conditions on his release. Whitaker, however, was a juvenile offender. The social interest in rehabilitating juvenile offenders strongly outweighs any interest in making the state liable for loss resulting from new crimes that might have been prevented had the state asked the court to delay the juvenile's release. The prospect of state tort liability should not be a factor in deciding whether to release a juvenile offender. *Neakok* does not control the case now before us.[32]

We consequently conclude that RESTATEMENT § 319 did not impose a tort duty on the state to seek a court-ordered extension of Whitaker's state commitment.

## B. The *D.S.W.* Considerations Would Not Justify Imposing a Duty Here.

In *D.S.W. v. Fairbanks North Star Borough School District* we adopted a list of considerations used by the California courts to decide whether, as a matter of policy, a tort duty should be imposed.[33] Although we have observed that there is no need to rely on the *D.S.W.* factors in deciding whether an actionable duty exists if the duty issue is governed by recognized principles of tort law,[34] we have nonetheless sometimes re-ferred to those factors in considering whether a "special relationship" gives rise to an actionable duty.[35] The ultimate question, of course, is whether the nature of the relationship imposes a duty to do particular things to control another.[36] For the reasons discussed in Part IV.A, the pre-release relationship between the state and Whitaker did not give rise to a duty to ask the court to extend his commitment.

The state relies prominently on the *D.S.W.* factors here, as did the superior court, and as we did in *Neakok* and in other cases in which there were special relationships.[37] We therefore briefly discuss those factors to confirm our conclusion that the state had no common-law tort duty based on its special relationship with Whitaker. We conclude that if those factors did control our analysis, they would not justify imposing a tort duty here.

▆▆▆ While the most important single *D.S.W.* factor is foreseeability,[38] we also consider the degree of certainty that the plaintiff suffered injury, the closeness of connection between the defendant's conduct and the plaintiff's injury, the moral blame attached to the defendant's conduct, the policy of preventing further harm, and the extent of the burden to the defendant and consequences to the community of imposing a burden of care.[39] When a public agency is involved, we further consider the extent of the agency's power, the role imposed on it by law, and the

---

**31.** 721 P.2d at 1130, 1132.

**32.** The state's brief in this case has not asked us to overrule *Neakok*. We recognize that considerations similar to those that we find dispositive here may bear on correctional decisions regarding adult offenders. Because we have not been asked to overrule *Neakok*, because the question whether to do so has not been briefed (indeed, the respondents have filed no brief), and because the present case is factually distinguishable, we decline to consider sua sponte whether *Neakok* remains good law or should be overruled.

**33.** 628 P.2d at 555 (citing *Peter W. v. San Francisco Unified Sch. Dist.*, 60 Cal.App.3d 814, 131 Cal.Rptr. 854, 859–60 (1976)).

**34.** *See, e.g., Kallstrom v. United States*, 43 P.3d 162, 167 (Alaska 2002); *Wongittilin v. State*, 36 P.3d 678, 681 (Alaska 2001); *Waskey v. Munici-*

*pality of Anchorage*, 909 P.2d 342, 343–44 (Alaska 1996).

**35.** *See, e.g., P.G. v. State, Dep't of Health & Human Servs.*, 4 P.3d 326, 331 (Alaska 2000); *R.E. v. State*, 878 P.2d 1341, 1347 (Alaska 1994); *Neakok*, 721 P.2d at 1125.

**36.** *Cf. P.G.*, 4 P.3d at 334; *M.A. v. United States*, 951 P.2d 851, 854 n. 6 (Alaska 1998).

**37.** *See, e.g., R.E.*, 878 P.2d at 1347 (holding there was duty under *D.S.W.* analysis and then confirming that this holding was "consistent" with common-law special relationship principles); *Neakok*, 721 P.2d at 1125.

**38.** *Neakok*, 721 P.2d at 1125.

**39.** *Id.*

limitations imposed on it by budget.[40]

The state may only be held liable for negligently failing to seek Whitaker's continued commitment "if it could have foreseen that its failure to do so might cause harm to [Sandsness]."[41] The superior court held that it was foreseeable Whitaker continued to pose a threat to society, given the state's extensive record of Whitaker's preoccupation with, and tendency towards violence, as well as his behavioral problems at McLaughlin Youth Center and other state institutions. The state argues that DFYS's general knowledge of Whitaker's dangerous propensity is insufficient to satisfy the foreseeability requirement.

The state places great weight on *Dinsmore-Poff v. Alvord.*[42] But that case did not present the legal question whether the relationship was such that it could give rise to an actionable duty to control another. Rather, the question was whether there was sufficient evidence to allow a jury to decide whether parents had reason to control their child. We noted that "[t]he [parents] were undisputedly on general notice of [their son's] dangerous propensity" before Dinsmore's murder.[43] But we affirmed the lower court's ruling because the plaintiffs did not present any evidence which could allow a

jury to believe that the parents had a duty to act to prevent their son from committing a specifically and imminently foreseeable harm.[44]

The superior court here noted that we rejected a similarly narrow view of foreseeability in discussing the duty issue in *Neakok.*[45] We there concluded that the parolee's "victims and his actions were within the zone of foreseeable hazards of the state's failure to use due care in supervising [the parolee]."[46] As we said more recently, "In the context of determining the existence of a duty, we have made it clear that foreseeability is a broad concept and does not require that the precise harm in a given case be predictable."[47]

The superior court discussed evidence that Whitaker had violent propensities.[48] Given what the state did know, we assume that it was sufficiently foreseeable that Whitaker might commit new crimes after his release from custody to satisfy the first *D.S.W.* duty consideration.

But foreseeability alone would not necessarily justify imposing a duty to act here. We have declined to impose a duty in some cases in which foreseeability was present.[49] Here the remaining considerations would strongly outweigh the foreseeability factor

**40.** *Thompson v. County of Alameda*, 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728, 733 (1980).

**41.** *Neakok*, 721 P.2d at 1127. *Neakok* explained that "[w]hile a specific case-by-case determination of foreseeability and causation lies within the province of a jury, the existence of a duty is a question of law." *Id.* at 1127 n. 7. Thus, in reviewing whether Whitaker's crime was sufficiently foreseeable to justify imposing a duty, we are not deciding whether the state should have foreseen the crime. *Id.* Rather, we are deciding whether, as a matter of judicial policy, a jury should be permitted to consider whether Whitaker's actions were foreseeable. *Cf. Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell*, 956 P.2d 1199, 1203–05 (Alaska 1998) (holding summary judgment appropriate where undisputed facts compel conclusion that one party owed no duty to other).

**42.** 972 P.2d 978 (Alaska 1999).

**43.** *Id.* at 985.

**44.** *Id.* at 987.

**45.** 721 P.2d at 1128–29.

**46.** *Id.* at 1129.

**47.** *P.G.*, 4 P.3d at 331 n. 11.

**48.** Whitaker's initial probation and commitment to the state's custody arose out of property crimes and underage consumption of alcohol. But Whitaker's institutional record included several documented escape plans involving "the planned usage of weapons that could cause deadly injuries," at least one unprovoked assault on another resident, and a period of treatment in the facility's Intensive Behavioral Adjustment Program. Whitaker apparently did not have a history of actually committing violent acts before his release.

**49.** *Mesiar v. Heckman*, 964 P.2d 445, 450 (Alaska 1998); *Kooly v. State*, 958 P.2d 1106, 1109–10 (Alaska 1998); *Karen L. v. State, Dep't of Health & Soc. Servs.*, 953 P.2d 871, 876 (Alaska 1998); *Schumacher v. City & Borough of Yakutat*, 946 P.2d 1255, 1257 n. 3 (Alaska 1997); *Hawks v. State*, 908 P.2d 1013, 1016 (Alaska 1995); *Estate of Day v. Willis*, 897 P.2d 78, 82 (Alaska 1995).

and complement our analysis under RESTATEMENT § 319.

There is no dispute that Sandsness suffered injury. But the connection between the consequence of Whitaker's crime and the state's failure to act is attenuated. As the state notes, DFYS could not have unilaterally extended Whitaker's commitment under AS 47.12.120(b)(1)—the superior court would have had to decide whether to grant the state's extension petition. The state's petition would have been a necessary, but not sufficient condition, for extending the commitment. Because Whitaker presented no particularized threat (as to when he might act, and against whom), the timing of his release was not obviously critical. As a juvenile offender, his commitment could not be extended indefinitely. It is not obvious that extending his commitment would have made him less likely to commit violent acts sometime after his eventual release.[50]

Regarding the degree of moral blame, the state persuasively argues that DFYS's decision not to seek a commitment extension is consistent with the established policy of attempting to rehabilitate juveniles by reintegrating them with their families and the public. Accordingly, the state cannot be blamed for the recognized risks that potentially dangerous juveniles generally pose to society upon release.

Likewise, the policy of preventing future harm would not obviously be served by imposing a duty. Under AS 47.12.010(b), initial commitment periods cannot extend beyond the juvenile's nineteenth birthday, and recommitment periods cannot extend beyond the juvenile's twentieth birthday. As the state admits, there is no clear correlation between the length of commitment and the rate of recidivism. Thus, there is no reason to believe that incarcerating all dangerous juveniles until their twentieth birthdays would likely produce a safer society. The opposite conclusion is at least equally likely. Society's commitment to the goal of rehabilitating juveniles by reintegrating them with their families and the public reflects an implicit belief that early reintegration is more likely to maximize public safety in the long-term than prolonged isolation of juveniles from their families and the broader community of law-abiding citizens.

The remaining *D.S.W.* factors include the burden on the defendant and the community if a duty of care were imposed, and considerations of the agency's appropriate role and the power accorded to it by law.[51] Collectively, these considerations strongly suggest that we should not impose an actionable duty to petition for commitment extensions for dangerous juveniles.

The state persuasively argues that imposing the duty described by the superior court would lead DFYS to petition to recommit virtually every juvenile with dangerous propensities, because it is impossible to accurately predict which are likely to engage in future criminal activity.[52] Likewise, the state would be discouraged from releasing these juveniles early (as happened here when DFYS released Whitaker about five weeks before his commitment was to expire). Both results would seriously undermine the goal of rehabilitation.[53]

Also, imposing a duty here would make the courts the sole arbiters of whether Alaska's juvenile offenders should be recommitted. Imposing a duty would encourage DFYS to petition for continued commitment in every questionable case to shield itself from potential liability, shifting the recommitment decision to the courts. This is contrary to the arrangement created by AS 47.12.120(b)(1). The statute requires DFYS and the court to agree to extend a juvenile's commitment pe-

---

**50.** The state further suggests that Whitaker's intentional murder of Sandsness severs DFYS's connection to the tragedy. But *Neakok* rejected a similar argument, reasoning that the parolee's intentional acts do not relieve the state of liability when those are the very acts the state may be under a duty to take reasonable steps to predict and prevent. 721 P.2d at 1136 n. 21.

**51.** *See Neakok,* 721 P.2d at 1125; *Thompson,* 167 Cal.Rptr. 70, 614 P.2d at 733.

**52.** *Neakok,* 721 P.2d at 1130 n. 13 (recognizing difficulties inherent in predicting potential dangerousness of released prisoners).

**53.** *See supra* Part IV.A.

riod.[54] This structural check against either institution's willingness to recommit juvenile offenders would be frustrated by imposing a civil tort duty.

Additionally, the professionals at DFYS are arguably better suited than the courts to weigh the risks of release against any net benefits of continued commitment. The duty described above could deprive the courts of DFYS's most candid appraisal, because DFYS could not simultaneously petition for continued commitment for the sake of avoiding liability and represent that, in its best judgment, further commitment is not worthwhile. The state further notes that the courts' resources would be significantly strained by requiring them to screen recommitment petitions for possibly 150 juveniles each year.

Finally, there is no principled way to limit the duty imposed by the superior court to the relatively minor governmental function of petitioning the superior court for commitment extensions of juveniles with known dangerous propensities.

## V. CONCLUSION

We therefore conclude that imposing the duty described by the superior court would interfere with the state's goal of rehabilitating youthful offenders without yielding any predictable gains in public safety. We accordingly REVERSE and REMAND for entry of summary judgment for the state.

MATTHEWS, Justice, with whom FABE, Chief Justice, joins, concurring.

I agree with the rationale and the result of today's opinion. But I think that our decision in *Division of Corrections v. Neakok*[1] should be overruled rather than merely distinguished and questioned.

We will overrule a prior decision when we are "clearly convinced that the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from a depar-

ture from precedent."[2] In my view this standard has been met regarding *Neakok*. The decision in that case as to the duty to impose parole conditions is not sound, in my opinion, because it imposes liability for decisions that are inherently discretionary as they involve balancing the sometimes conflicting goals of rehabilitation and protection of the public. Like initial sentencing decisions, this is an area where state officials should not be second-guessed in a tort trial. The result of *Neakok*, I believe, has been to cause corrections officials to err on the side of restrictiveness when considering discretionary parole. Today's opinion recognizes these problems in the context of juvenile justice and recognizes that they may also apply to adult corrections.

In my judgment, we should frankly recognize that *Neakok* is unsound and overrule it rather than allow it to continue to work its mischief.

---

54. *See* AS 47.12.120(b)(1) ("[T]he department may petition for and the court may grant ... extensions of commitment...."). In contrast, either the court or DFYS can release a juvenile before his commitment period lapses. *Id.*